**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Lola P. Thompson<br>1562 W. 4th Street Apt 204<br>Los Angeles, CA 90017<br><br>TELEPHONE NO.: 213-269-7780    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: Lipthompson@yahoo.com<br>ATTORNEY FOR *(Name)*: In Pro Per | **FOR COURT USE ONLY** |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES |
|---|
| STREET ADDRESS: 111 North Hill Street |
| MAILING ADDRESS: 111 North Hill Street |
| CITY AND ZIP CODE: Los Angeles, CA  90012 |
| BRANCH NAME: Stanley Mosk Courthouse |

| PLAINTIFF/PETITIONER:  Lola P. Thompson | CASE NUMBER<br>21STCV33023 |
|---|---|
| DEFENDANT/RESPONDENT:  United States Department of Education | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No. |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. [x] summons

   b. [x] complaint

   c. [ ] Alternative Dispute Resolution (ADR) package

   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*

   e. [ ] cross-complaint

   f. [x] other *(specify documents)*: First Amended Complaint and First Amended Summons
      *Two (2)* –Notice and Acknowledgment of Receipt and a prepaid return envelope

3. a. Party served *(specify name of party as shown on documents served)*:
      Office of the General Counsel

   b. [ ] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:

4. Address where the party was served:
   United States Department of Education, 400 Maryland Avenue S.W., Washington, DC 20202

5. I served the party *(check proper box)*

   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date)*:    (2) at *(time)*:

   b. [ ] **by substituted service.** on *(date)*:    at *(time)*:    I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:    from *(city)*:    or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

**PROOF OF SERVICE OF SUMMONS**   Code of Civil Procedure, § 417.10

MAR 1 AM 8:59

3

EXHIBIT 1

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NO | FOR COURT USE ONLY |
|---|---|---|

NAME  Lola P. Thompson
FIRM NAME  In Pro Per
STREET ADDRESS  1562 W. 4th Street Apt 204
CITY  Los Angeles  STATE  CA  ZIP CODE  90017
TELEPHONE NO  213-269-7780  FAX NO
E-MAIL ADDRESS  Lipthompson@yahoo.com
ATTORNEY FOR (Name)  In Pro Per

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS  111 North Hill Street
MAILING ADDRESS  111 North Hill Street
CITY AND ZIP CODE  Los Angeles, CA  90012
BRANCH NAME  Stanley Mosk Courthouse

Plaintiff/Petitioner:  Lola P. Thompson

Defendant/Respondent:  United States Department of Education

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: 21STCV33023 |
|---|---|

TO *(insert name of party being served):*  United States Department of Education

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  February 25, 2022

_____          ▶  *Iris Bernard*
Iris Bernard
(TYPE OR PRINT NAME)                          (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*

1. ☐ A copy of the summons and of the complaint.

2. ☒ Other *(specify):*

   This is a second copy of the First Amended Summons and First Amended Complaint that was sent to you on February 7, 2022.  This Notice and Acknowledgment of Receipt was not included in the original package.  Please accept my apology and return this Acknowledgment by using the prepaid return envelope that is provided for you.  Thank You.

*(To be completed by recipient):*

Date this form is signed: _____

_____          ▶  _____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)          ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure, §§ 415.30, 417.10 www.courtinfo.ca.gov |
|---|---|---|

4

EXHIBIT 1

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NO | FOR COURT USE ONLY |
|---|---|---|

NAME  Lola P. Thompson
FIRM NAME  In Pro Per
STREET ADDRESS  1562 W. 4th Street Apt 204
CITY  Los Angeles        STATE  CA    ZIP CODE  90017
TELEPHONE NO  213-269-7780    FAX NO
E-MAIL ADDRESS  Lipthompson@yahoo.com
ATTORNEY FOR (Name)  In Pro Per

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS  111 North Hill Street
MAILING ADDRESS  111 North Hill Street
CITY AND ZIP CODE      Los Angeles, CA  90012
BRANCH NAME  Stanley Mosk Courthouse

Plaintiff/Petitioner:  Lola P. Thompson

Defendant/Respondent:  United States Department of Education

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>21STCV33023 |
|---|---|

TO (insert name of party being served):  United States Department of Education

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  February 25, 2022

Iris Bernard
(TYPE OR PRINT NAME)

▶  *Iris Bernard*
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):

1. [ ] A copy of the summons and of the complaint.
2. [x] Other (specify):

   This is a second copy of the First Amended Summons and First Amended Complaint that was sent to you on February 7, 2022.  This Notice and Acknowledgment of Receipt was not included in the original package.  Please accept my apology and return this Acknowledgment by using the prepaid return envelope that is provided for you.  Thank You.

(To be completed by recipient):

Date this form is signed: _____

_____              ▶ _____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,              (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)              ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |
|---|---|---|

5

EXHIBIT 1

*First Amended*

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)
CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

FEB 07 2022

Sherri R. Carter, Executive Officer/Clerk of Court

By: Cristina Grijalva, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Dr. Miguel Cardona, Secretary of the U.S. Department of Education,
United States Department of Education,  Nelnet Servicing, LLC,  and F.H. Cann & Associates, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Lola P. Thompson
In Pro Per

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero o bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: *(Número del Caso):* |
|---|---|
| *(El nombre y dirección de la corte es):*  Stanley Mosk Courthouse | 21STCV33023 |

Superior Court of California, County of Los Angeles
111 North Hill Street,  Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Lola P. Thompson, In Pro Per,  1562 W. 4th Street Apt 204,  Los Angeles, CA 90017   (213) 269-7780

| DATE: FEB 07 2022 | SHERRI R. CARTER | Clerk, by | CRISTINA GRIJALVA | , Deputy |
|---|---|---|---|---|
| *(Fecha)* February 7, 2022 | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario*  Proof of Service of Summons, *(POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* Government Agency
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

LOLA P. THOMPSON
1562 W. 4TH Street Apt 204
Los Angeles, CA 90017
Tel: (213) 268-4160

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

FEB 07 2022

Sherri R. Carter, Executive Officer/Clerk of Court

By: Cristina Grijalva, Deputy

*new*
*Telephone No.*
*213-269-7780*

                                    COURT OF CALIFORNIA
                                    TY OF LOS ANGELES

| | |
|---|---|
| LOLA P. THOMPSON, | Case No.: 21STCV33023 |
| Plaintiff, | Assigned for All Purposes to the Hon. Elaine Lu  -  Dept. 26 |
| v. | |
| DR. MIGUEL CARDONA, Secretary of the U.S. Department of Education, | FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FROM AN UNLAWFUL GARNISHMENT, AND FOR DAMAGES |
| UNITED STATES DEPARTMENT OF EDUCATION, | |
| NELNET SERVICING, LLC | HEARING DATE: |
| | TIME: |
| and | DEPT:    26 |
| F.H. CANN & ASSOCIATES, INC., | JUDGE:  Hon. Elaine Lu |
| Defendants. | Date Action Filed: September 8, 2021 Trial Date:  Not Set |

## THE PARTIES

1. The plaintiff, Lola P. Thompson, is currently having her Social Security Administration Retirement Benefits garnished by the defendants in Los Angeles County, California, the home residence of the plaintiff and is within the jurisdiction of this court.

2. Defendants:  Dr. Miguel Cardona, Secretary of the United States Department of Education ("the Secretary"), the United States Department of Education ("the Department", "DOE" or "ED"), Nelnet Servicing, LLC ("Nelnet") and F.H. Cann & Associates, Inc. ("FHC or FH Cann") collect education loans from students nationwide and within the jurisdiction of this court in Los Angeles County, CA

## VENUE AND JURISDICTION

3. Jurisdiction is proper in this court because this litigation arises under federal law,  the Administrative Procedure Act, 5 U.S.C. §§ 701-706,  Title 20 - Education Chapter 28 - Higher Education Resources and Student Assistance, 20 U.S.C. § 1001, *et seq* - General Definitions of the Institution of Higher Education.  This Court has jurisdiction over this civil action arising under federal laws 28 U.S. Code § 1331 - Federal Question, 28 U.S.  Declaratory Judgments, Code § 2201- Creation of remedy and 28 U.S. Code § 2202 - Further relief.  Code of Federal Regulations, Title 34, Education, Subtitle B, Regulations of the Offices of the Department of Education 34 CFR § 682.402 (Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments-FFEL), 34 CFR  § 685.213 (Total and Permanent Disability Discharge), and 34 CFR § 674.47 (Costs chargeable to the Fund).  Also included are federal laws 20 U.S.C. § 1087 (Repayment by Secretary of loans of Bankrupt, Deceased, or Disabled Borrowers), 26 U.S. Code § 6103 (Confidentiality and Disclosure of Returns and Return information), and  20 U.S.C. § 1098h (Procedure and Requirements for requesting Tax Return information from the IRS).

4. Venue is proper in this district for the defendants under 28 U.S.C. § 1391(b)(2)  "Venue in General.—A civil action may be brought in—... a judicial district in which a substantial part of

the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated". The plaintiff's garnishment is in Los Angeles County.

5. Venue is proper in this district under 28 U.S.C. § 1391(c)(1) "RESIDENCY.— For all venue purposes—a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled." The plaintiff resides in this judicial district of Los Angeles County.

6. On December 3, 2018, the Department reinstated eight of the plaintiff's loans, three years and 11 months past the end of the 3-year post-discharge monitoring period. This means the plaintiff was monitored from January 20, 2012, her Total and Permanently Disabled (TPD) Discharge date, to December 3, 2018, six years and eleven (11) months. If they had waited one more month, until January 3, 2019 instead of December 3, 2018, the amount of time the plaintiff was monitored after her TPD Discharge would be seven (7) years exactly, from January 2012 to January 2019.

7. The defendants waited patiently, for seven years for the plaintiff's Social Security Disability (SSDI) Benefits to be automatically converted to Retirement Benefits. The defendants ignored all the rules and regulations in order to illegally attack the plaintiff and garnish her benefits. She was treated as if she were a prisoner or slave. She had no rights to privacy for seven years, which is four years past the 3-year post-discharge monitoring period and so very illegal, pursuant to 34 CFR § 682.402(c)(6)(i) Conditions for reinstatement of a loan after a total and permanent disability discharge. The Secretary reinstates the borrower's obligation to repay a loan that was discharged in accordance with paragraph (c)(3)(iii) of this section if, "within three years" after the date the Secretary granted the discharge.

8. The defendants had 3 years to monitor the plaintiff's IRS information pursuant to 20 U.S. Code § 1087(a)(3)(B)(ii) (3)AUTOMATIC INCOME MONITORING - (A) In general The Secretary shall

establish and implement, with respect to any borrower described in subparagraph (B), procedures to—(i) use return information disclosed under section 6103(l)(13) of title 26, pursuant to approval provided under section 1098h of this title, to determine the borrower's continued eligibility for the loan discharge described in subparagraph (B);  (B) ApplicabilitySubparagraph (A) shall apply— (i) to each borrower of a loan that is discharged due to the total and permanent disability (within the meaning of this subsection) of the borrower; and (ii) during the period beginning on the date on which such loan is so discharged and ending on the first day on which such loan may no longer be reinstated.   The first day on which the plaintiff's loans could no longer be reinstated was January 20, 2015, it is the last day she gave the department permission to monitor her IRS income information, not 3 years 11 months later on December 3, 2018, making the monitoring last far too long.

9. Pursuant to 20 U.S. Code § 1098h (a)(3)  Total and Permanent Disability.  In the case of any written or electronic application by an individual for a discharge of a loan under this subchapter based on total and permanent disability (within the meaning of section 1087(a) of this title) that requires income monitoring, the Secretary shall—(A) provide to such individual the notification described in paragraph (1)(A)(i)(I); and (B) require, as a condition of eligibility for such discharge, that such individual— (i) affirmatively approve the disclosure described in paragraph (1)(A)(i)(I) and agree that such approval shall serve as an ongoing approval of such disclosure until the earlier of—(I) the date on which the individual elects to opt out of such disclosure under section 1087(a)(3)(A) of this title; or (II) the first day on which such loan may no longer be reinstated.  The first day on which the plaintiff's loans could no longer be reinstated was three years after the Secretary discharged her loans due to TPD which is January 20, 2015, which is the day her approval for disclosure of her income information ended.

10. After seven years of monitoring the plaintiff's income the department reinstated the plaintiff's loans on December 3, 2018 and started garnishment of the plaintiff's benefits on May 3, 2019 for no legitimate reason, other than greed and inhumanity. This is despicable behavior by the Department and is the definition of fraud pursuant to Code of Civil Procedure § 3294 (c)(3) As used in this section, the following definitions shall apply: "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

11. This illegal seven year garnishment in the making is based on a Debt Statement (see Exhibit 50) that was sent to the plaintiff on December 4, 2018. The plaintiff was given 65 days to pay the loan in full or According the the Debt Statement "To avoid Treasury offset, you must agree to pay the debt under terms accepted by the Department, and must actually make the first payment under the agreement within 65 days of the date of the Debt Statement and continue to make timely payments.....*If You Miss a Deadline for Exercising Your Rights* You may obtain documents, a review or hearing, or enter into a repayment agreement even if you miss the deadlines in this Notice. However, if the Department has already requested that Treasury offset your Federal and State tax refunds and other payments, the Department will not withdraw the request until you prove that the debt is not legally enforceable or not past-due. Therefore, your Federal and State tax refunds and other payments may be offset if you request a review or establish a repayment agreement after the deadlines. If you later prove that the debt was not enforceable by offset, the Department will return the amount collected that exceeded the proper amount."

12. On December 4, 2018, a Debt Statement was sent to the plaintiff with the following information:

**Debts covered by this notice.**
**Note: balances shown on this notice are as of November 28, 2018.**

| Debt Number | School | Original Amount and Date | Prior Debt Holder | Current Principal | Current Interest |
|---|---|---|---|---|---|
| 7014878 | GLOBE UNIVERSITY | $1,000.00 06/22/1982 | Total and Permanent Disability Servicer | $0.01 | $464.85 |

**Additional Defaulted Debts Held by the U.S. Department of Education**

The U.S. Department of Education holds the following additional defaulted debts for which you were previously sent notice. These debts may have already been referred for offset, as explained in prior notices. If you object to collection of the debts identified above, you must submit your objections pursuant to the requirements in the enclosed notice, even if those objections are the same as objections you have previously raised related to the additional defaulted debts.

| Debt Number | School | Original Amount and Date | Prior Debt Holder | Current Principal | Current Interest |
|---|---|---|---|---|---|
| 7015027 | New Mexico Institute of Mining | $1,442.00 | 01/07/1985 | Total and Permanent Disability Servicer | $1,674.02 | $2,299.14 |
| 7014891 | New Mexico Institute of Mining | $2,116.00 | 07/09/1984 | Total and Permanent Disability Servicer | $2,457.21 | $3,374.73 |
| 7015090 | New Mexico Institute of Mining | $1,635.00 | 07/08/1985 | Total and Permanent Disability Servicer | $1,808.02 | $2,929.20 |
| 7015061 | New Mexico Institute of Mining | $2,500.00 | 08/23/1983 | Total and Permanent Disability Servicer | $2,649.74 | $3,633.68 |
| 7015036 | New Mexico Institute of Mining | $2,404.00 | 06/21/1985 | Total and Permanent Disability Servicer | $2,791.28 | $3,835.63 |
| 7015049 | New Mexico Institute of Mining | $2,500.00 | 10/02/1986 | Total and Permanent Disability Servicer | $3,244.95 | $7,384.16 |
| 7014917 | New Mexico Institute of Mining | $1,442.00 | 08/20/1984 | Total and Permanent Disability Servicer | $1,648.27 | $2,296.15 |

13. According to this December 4, 2018 Debt Statement, there is only one loan that is covered by the statement.   This loan  was received by the plaintiff at Globe College of Business, in St. Paul, MN on June 22, 1982.  The amount of the loan was one-thousand dollars ($1,000.00).  The current principal on the loan is one penny, that is one cent ($0.01) , however the interest on that one-red-cent is $464.85.  "The U.S. Department of Education holds the following **Additional Defaulted Debts**", which are seven loans from New Mexico Institute of Mining & Technology. The seven loans that were added to the debt statement were discharged due to TPD  on January 20, 2012.  Nelnet reinstated these loans fraudulently on September 22, 2015.  The status of the plaintiff's loans was falsified when changed from DEFAULTED/THEN DISABLED to DEFAULTED/ THEN UNRESOLVED.   There was no valid reason for this change.

14.  The fact that this Globe loan was written off and canceled on April 2, 1993 and is not collectible does not matter to these despicable Defendants.  Pursuant to 34 CFR § 674.47 (h)(2)&(3) (Costs chargeable to the Fund).  "*Write-offs of accounts.*  An institution that writes off an account under this paragraph may no longer include the amount of the account as an asset of the Fund. When the institution writes off an account, the borrower is relieved of all repayment obligations." This makes the one-cent debt illegal.  The following is the listing for this Globe loan on the plaintiff's National Student Loan Data System (NSLDS) file.  The principal on this loan is one cent ($0.01):

```
Loan Status:DW
Loan Status Description:DEFAULTED, WRITE-OFF
Loan Status Effective Date:04/02/1993
Loan Disbursement Date:06/22/1982
Loan Disbursement Amount:$1,000
Loan Contact Type:Current ED Servicer
Loan Contact Name:DEBT MANAGEMENT AND COLLECTIONS SYSTEM
Loan Contact Street Address 1:DEFAULT RESOLUTION GROUP
Loan Contact Street Address 2:P.O. BOX 5609
Loan Contact City:GREENVILLE  Loan Contact State Code:TX  Loan Contact Zip Code:75403
```

15.  This Globe loan can not be collected because it is no longer a debt.  Thereby, making this a very fraudulent sham of a "Debt Statement".   Collecting on a loan for one cent (one penny) that was written off in 1993.  There is no legal reason for reinstating this written off one cent loan. There is no legal reason to add the remainder of the plaintiff's loans to this debt statement, ignoring the fact that all of her loans had been discharged by the Secretary due to TPD on January 20, 2012. This fraudulent unlawful garnishment is happening because the plaintiff turned sixty-six and her SSDI Benefits and were automatically converted to Retirement Benefits.  The defendants are taking advantage of and robbing the "Economically Disadvantaged", poor with income below the Poverty Guideline, the "Elderly", a senior citizen that has reached and passed the retirement age of 66, and the "Handicapped", declared Total and Permanently Disabled on January 22, 2010 by the Social Security Administration (SSA) and January 20, 2012 by the DOE.  Now add "Underprivileged" a Black female, and you have the most discriminated against person in the United States, the lowest

person on the salary pay scale, and the last to be hired.  The plaintiff remembers one line she was given throughout her lifetime of job searching   "Sorry, we already have a Black girl in the office".

16.  This is despicable behavior by the Defendants and is the definition of fraud, malice and oppression pursuant to Code of Civil Procedure § 3294(c) As used in this section, the following definitions shall apply:  (1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.  (2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

17.  On October 1, 2018, FHC had no legal right to start collections against the plaintiff, but they did so anyway.  The Department had not reinstated the plaintiff's loans.   A debt statement had not been created and sent to the plaintiff.  FHC also started to accrue interest charges and collection fees.  FHC states in their October 1, 2018 letter "This notice regarding your defaulted student loan or grant overpayment debt held by the U.S. Department of Education is from F.H. Cann & Associates, Inc. and has been placed with our office for collection. The balance listed above is owed to the U.S. Department of Education and the principal continues to accrue interest daily. This balance is effective as of today, October 1, 2018, and may not be an accurate pay-off figure; this balance may increase due to the accrual of interest or assessment of collection costs." The total balance listed was $51,029.93.

18.  Two months later, on December 3, 2018, a Debt statement was created giving the plaintiff a 65 day grace period before the debt became fully due.  FHC denied the plaintiff the 65-day grace period to pay the debt in full before interest and collection costs are incurred.  FHC had started collecting on October 1, 2018, 60 days before the 65-day grace period started, making this

8

125 days of illegal collections and accrual of interest and fee amounts breaking the Code of Federal

Regulations pursuant to 34 CFR § 682.402(c)(6)(ii) If the borrower's obligation to repay a loan is

reinstated, the Secretary -   (A) Notifies the borrower that the borrower's obligation to repay the loan

has been reinstated; and (C) Does not require the borrower to pay interest on the loan for the period

from the date the loan was discharged until the date the borrower's obligation to repay the loan was

reinstated. 34 CFR § 682.402(c)(6)(iii)(A)(B) The Secretary's notification under paragraph

(c)(6)(ii)(A) of this section will include - (A) The reason or reasons for the reinstatement; (B) An

explanation that the first payment due date on the loan following reinstatement will be "no earlier

than 60 days after the date of the notification of reinstatement".   FHC unlawfully jumped to the

head of the line, collecting on loans two months before the plaintiff was notified of the debt, instead

of two months after the plaintiff received notification of the debt.

19.  On FHC's October 1, 2018 collection notice the collection costs were $9,989.29

more than the 17.92 percent fee permitted by the DOE on their loans.  According to FSA at the

following website: https://studentaid.gov/manage-loans/default/collections  "If your loan is

placed with a collection agency, you will be responsible for costs incurred by your loan holder

to get payment. These costs amount to 17.92% of your loan amount if your loan is held by ED.

Other loan holders may charge a different amount."

20.  FHC continued its collections by sending another collection notice, on November 6,

2018 (see exhibit 10a).  And then another collection notice one week later on November 14, 2018

(see exhibit 10b).  FHC sent the plaintiff three (3) collection notices in less than 45 days.  The

collection fee was reduced on the third and fourth collection notices to the proper 17.92 percent.

The interest amount on October 1st was $24,767.13.   On the April 2, 2019  collection notice (see

exhibit 9) the interest had increased to $26, 714.94.  In five months from October 1, 2018 to April 2,

2019, FHC added $1,947.81 in interest charges and $100 in fees to the plaintiff's account.

21.  The 9% interest rate used by FHC was the loan interest rate approved by the

1  Department forty years ago, in 1982 and 1983. This 9% rate is also the rate on the Plaintiff's

2  Promissory Notes for her New Mexico Institute of Mining & Technology (NMIMT) loans,

3  from 1983 to 1986. The interest amount charged by FHC in five months, $1,947.81, is more

4  than the plaintiff's garnishment could pay in five months. The plaintiff's first offset payment

5  was $177.15 times five equals $885.75, so she would never pay the loans off in her lifetime due

6  to accruing interest, fees and capitalization. Again please note that this interest and these fees

7  started accruing on October 1, 2018, two months before the Debt Statement was sent on

8  December 4, 2018. Interest also accrued the two months after the Debt Statement was sent,

9  when the debt should still have been free from accruing interest. This is more fraud, malice

10  and oppression by FHC.

11  22. FHC ignored the federal rules and regulations and sent the plaintiff another notice on

12  April 2, 2019 with a total due of $50,691.97, plus more interest, one month before the plaintiff's

13  SSA retirement benefits were garnished on May 3, 2019. This April notice contained a TPD

14  discharge application. The plaintiff did not need a TPD discharge application.

15  23. On May 3, 2019, the defendants: the Department, Nelnet and FHC illegally,

16  fraudulently and maliciously garnished $177.15 from the plaintiff's Social Security Administration

17  ("SSA") Retirement Benefit Check, fifteen (15) percent of $1,181.00. The garnishment was

18  referred to the U.S. Department of the Treasury ("Treasury") for an unlawful collection by the

19  Department's Default Resolution Group ("DRG") and the Department's Collection Agency, FHC.

20  24. The defendants continued this garnishment until March 20, 2020 when the CARES Act

21  temporarily suspended all ED-owned federal student loan collections until September 30, 2021.

22  25. On December 17, 2020, FHC sent the plaintiff a fifth Collection notice (see exhibit

23  9a). The interest amount had increased to $27, 106.44 which increased the total interest accrued

24  by FHC to $2,339.31. Fees increased to $7,773.69 an increase of $70.17 over a period of months.

26.  The Department's DRG, let the plaintiff know that they had no intention of stopping this garnishment by giving the plaintiff the address to use should she decide to file a suit against them. The last letter the plaintiff received from the DRG, the Debt Collection Branch of the Department dated January 25, 2021 states "You state that you will file suit against the Department. The legal documents should be sent to: U.S. Department of Education,  Office of the General Counsel, 400 Maryland Avenue S.W., Washington, DC 20202".

27.  The plaintiff sent three letters to the Department's Federal Student Aid (FSA),  the Department's DRG and FH Cann.  The letters included documents and letters proving this is an unlawful garnishment and they were ignored.  The dates of the plaintiff's letters are listed below:

(1) June 13, 2019 (see Exhibit 37)
    To:    U.S. Department of Education         F.H. Cann & Associates, Inc.
            FEDERAL OFFSET UNIT           1600 Osgood St. Suite 20-2/120
            P.O. Box 5227             North Andover, MA  01845
            Greenville, TX 75403
            (Known as the Default Resolution Group)

            U.S. Department of the Treasury      Pioneer Credit Recovery, Inc.
            Bureau of Fiscal Service          P. O. Box 500
            P.O. Box 1686             Horseheads, NY 14845
            Birmingham, AL 35201-1686

(2) December 9, 2020 (see Exhibit 5)
    To:    Federal Student Aid (FSA)         F.H. Cann & Associates, Inc.
            Office of the U.S. Department of Education   1600 Osgood St. Suite 20-2/120
            Default Resolution Group, Servicing Center  North Andover, MA  01845
            P.O. Box 5227, Greenville, TX  75403

            Data Management & Collections System
            Default Resolution Group
            P.O. Box 5609, Greenville, TX 75403-5609  800-621-3115

(3) January 12, 2021 (see Exhibit 4)
    To:    Federal Student Aid (FSA)         F.H. Cann & Associates, Inc.
            Office of the U.S. Department of Education   1600 Osgood St. Suite 20-2/120
            Default Resolution Group, Servicing Center  North Andover, MA  01845
            P.O. Box 5227, Greenville, TX  75403

28.  According to the Department's DRG letters dated March 29, 2019 (see Exhibit 1) and July 19, 2019 (see Exhibit 2)  "The Nelnet Total and Permanent Disability Servicer previously

11

approved your request for loan discharge due to total and permanent disability, and your student loans were discharged. On September 22, 2015, we received notification to reinstate your obligation to repay your discharged federal student loans because the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-discharge monitoring period. Therefore, the Department's Default Resolution Group resumed collection of this debt".

29. The 3-year post-discharge monitoring period ended on January 20, 2015. The fraudulent, arbitrary reinstatement date established by the Nelnet and supported by the DRG, September 22, 2015, is not within the plaintiff's 3-year post-discharge monitoring period. This September reinstatement date was used in letters to the plaintiff to hide the fact that the defendants had actually reinstated the plaintiff's loans on "December 3, 2018" which lead to this garnishment of the plaintiff's SSA Retirement Benefits. And the plaintiff had been fooled by the defendants trickery and deceit, until she started doing research for her First Amended Complaint. The defendants never acted on that September 22, 2015 reinstatement date. There were no attempts to collect this debt for the plaintiff's loans in 2015, 2016, or 2017, therefore this fraudulent debt and fraudulent reinstatement date are moot.

30. This December 4, 2018 Debt Statement was the first notice that the plaintiff received from the DOE claiming her loans were in default, since the year 2010. The plaintiff's offset payments were terminated on November 3, 2011, when the plaintiff applied for a TPD discharge and the Secretary stopped her offset payments pursuant to 34 CFR § 682.402 (c)(2)(ii) If the borrower notifies the Secretary of the borrower's intent to apply for a total and permanent disability discharge, the Secretary - (C) Directs the lenders to suspend efforts to collect from the borrower for a period not to exceed 120 days. The plaintiff's made her final offset payment on November 3, 2011 and she was determined to be totally and permanently disabled by the Secretary on January 20, 2012.

31. The Department's DRG, sent the plaintiff three letters dated March 29, 2019 (see Exhibit 1), July 19, 2019 (see Exhibit 2) and January 25, 2021 (see Exhibit 3), as responses to the plaintiff letters and pleas to them to stop this garnishment. Nelnet and DRG made false statements about the reinstatement date, September 22, 2015, of the plaintiff's loans and the reason for the reinstatement. The defendants concealed their knowledge of the existence of this newer **"December 3, 2018 reinstatement date"** that was actually the cause of this unlawful garnishment. These are knowingly false statements and concealments by Nelnet and DRG.

32. Pursuant to statute 31 U.S. Code § 3801(a)(5) "knows or has reason to know", for purposes of establishing liability under section 3802, means that a person, with respect to a claim or statement— (A) has actual knowledge that the claim or statement is false, fictitious, or fraudulent; (B) acts in deliberate ignorance of the truth or falsity of the claim or statement; or (C) acts in reckless disregard of the truth or falsity of the claim or statement, and no proof of specific intent to defraud is required. This is also the definition of fraud in Code of Civil Procedure § 3294(c)(3) (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

33. This is an abuse of power and discretion to ignore federal regulations. This is oppression of the plaintiff's legal rights. The defendants are maliciously taking SSA Retirement benefits payments from a poor, physically disabled, elderly, seventy-two year old, underprivileged, black woman. Only criminals take money that does not belong to them from people. Usually these criminals use a gun, or some time of scam, because people don't willingly give up their money. The defendants don't need a gun to rob the plaintiff, they use lies, false statements, fraudulent records and their authority as agents of the federal government.

34.  The plaintiff is requesting that this court hear her plea to stop this fraudulent and unlawful garnishment and return the funds that have already been garnished.  (5 U.S.C. § 702) - "Right of review - A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof…"   According to 5 U.S.C. § 706(2)(A) "The reviewing court shall… hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law".  If not enjoined by this Court, the defendants will continue to garnish the plaintiff's SSA Retirement Benefit payments.

35.  The plaintiff believes:

**I.  FIRST CAUSE OF ACTION:**   The plaintiff demands Injunctive and Declaratory Relief from a fraudulent, unlawful, malicious monthly garnishment of the plaintiff's Social Security Retirement Benefits.  The Defendants have garnished a total of seven offset payments from the plaintiff by using deceit, false statements and claims, fraudulent records, misrepresentations, and concealments.

    **A.  MISREPRESENTATION OF THE REINSTATEMENT DATE FOR THIS GARNISHMENT  SEPTEMBER 22, 2015 OPPOSED TO DECEMBER 3, 2018**

        **(1)  ATTEMPT TO DECEIVE**

        **(2)  CONCEALMENT**

    **B.  THE FRAUDULENT FINANCIAL REASON FOR SEPTEMBER 22, 2015 REINSTATEMENT**

    **C.  THREE FRAUDULENT, ARBITRARY REINSTATEMENT DATES**

        **(1)  DECEMBER 3, 2018  -  INTENTIONAL FRAUD AND DECEIT**
            **(a)  ILLEGAL COLLECTIONS**
            **(b)  ILLEGAL DEBT - ONE-CENT ($0.01)**
            **(c)  ONE-CENT WAS USED TO CREATE A FRAUDULENT DEBT STATEMENT**

        **(2)  SEPTEMBER 22, 2015  -  INTENTIONAL FRAUD AND DECEIT**

EXHIBIT 1

(3) JANUARY 1, 2015 - INTENTIONAL FRAUD AND DECEIT

D. **TWO FRAUDULENT TPD DISCHARGE DATES AND TOO MANY ACCOUNT NUMBERS**

| | | | |
|---|---|---|---|
| (1) | JAN. 20, 2012 | 1002320370 | OFFICIAL TPD |
| (2) | MARCH 1, 2012 | 256546 | FRAUDULENT TPD |
| (3) | MAY 9, 2013 | E856039679 | FRAUDULENT ACCT |

E. **THE DEFENDANTS ARE DEMANDING THAT THE PLAINTIFF LIE ON HERSELF AND FALSIFY A NEW TPD DISCHARGE APPLICATION AS THE ONLY WAY TO END THIS NEVER ENDING GARNISHMENT**

(II) SECOND CAUSE OF ACTION:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(III)  PRAYER FOR COMPENSATORY DAMAGES

(IV)  PRAYER FOR RELIEF

(V)  EXHIBIT LIST

GENERAL ALLEGATIONS

I. FIRST CAUSE OF ACTION:  FRAUDULENT, UNLAWFUL MALICIOUS MONTHLY GARNISHMENT OF THE PLAINTIFF'S SSA RETIREMENT BENEFITS

A. **MISREPRESENTATION AND CONCEALMENT OF THE REINSTATEMENT DATE FOR THIS GARNISHMENT  9/22/2015 OPPOSED TO 12/3/2018**

36.  The garnishment of the plaintiff's SSA benefits that started on May 3, 2019 was triggered by a Debt Statement dated December 4, 2018.  This realization was achieved by the plaintiff after reviewing her documents and letters from the defendants while she was working on amending her complaint.  Prior to this realization, the plaintiff thought that she was contesting a September 22, 2015 reinstatement date.  But finally, the plaintiff could see that the Debt Statement she received dated December 4, 2018, contained the same loans and amounts that FHC was using on

Complaint for Injunctive and Declaratory Relief from Garnishment
EXHIBIT 1

their unlawful October 2018 and November 2018 collection notices.

37. The plaintiff never received a Reinstatement Letter for her loans, so she was not aware that her loans had been reinstated. She also did not receive a reinstatement letter in 2015. This seems to be a recurring theme. "Let us conceal the borrower's reinstatement letters and notices, so that she cannot contest her reinstatement in time enough to stop the garnishment of her benefits."

38. December 3, 2018 would have to be the reinstatement date, because the Debt Statement was created on December 4, 2018. According to law, the debt statement is sent the day after the loans are reinstated by the Secretary pursuant to 34 CFR § 682.402(c)(6)(ii)(A), (B) & (C)  If the borrower's obligation to repay a loan is reinstated, the Secretary - (A) Notifies the borrower that the borrower's obligation to repay the loan has been reinstated; and 34 CFR § 682.402(c)(6)(iii)(B) An explanation that the first payment due date on the loan following reinstatement will be "no earlier than 60 days after the date of the notification of reinstatement".

39. This December 4, 2018 Debt Statement awarded the plaintiff 65 days to make the first payment. "To avoid Treasury offset, you must agree to pay the debt under terms accepted by the Department, and must actually make the first payment under the agreement within 65 days of the date of the Debt Statement and continue to make timely payments."

40. The plaintiff kept wondering why FHC was trying to collect on her loans in October and November of 2018 before any notices were sent from the Department about defaulted loans. When plaintiff received the Debt Statement on Dec 4, 2018 she still could not figure out what was going on. So she called all the numbers listed on FHC's collection notices and the DRG's number, 800-621-3115 which was included on the Debt Statement Explanation Page explaining "Your Rights".

41. The first response the plaintiff received was from the Department's DRG in a letter dated March 29, 2019 (see Exhibit 1) stating,  "The Nelnet Total and Permanent Disability Servicer previously approved your request for loan discharge due to total and permanent disability, and your student loans were discharged. On September 22, 2015, we received notification to reinstate your

obligation to repay your discharged federal student loans because the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-discharge monitoring period. Therefore, the Department's Default Resolution Group resumed collection of this debt".

42.  This response was repeated in a letter dated July 19, 2019 (see Exhibit 2).  The response states that this collection of the plaintiff's debts was caused by a reinstatement date of September 22, 2015.  That statement is false, it is a lie, it is deceitful.

43.  This response was meant to deceive the plaintiff and it worked until January 26, 2022, when the plaintiff realized she had been deceived by the defendants, the Department's DRG and Nelnet used deceit, fraud and trickery to pretend this 2018 reinstatement is based on financial reasons given by Nelnet in 2015.   It made the plaintiff think that this 2019 garnishment of her SSA Benefits was being caused by a fraudulent September 22, 2015 reinstatement date.   When in reality the 2015 reinstatement had nothing to do with the current 2019 garnishment.  This 2019 garnishment is being triggered and caused by a Debt Statement dated December 4, 2018 for a Globe College of Business loan that has a one cent ($0.01) principal face value amount, but no real value because it was written off.

44.  The loan being used for the reinstatement of the plaintiff's loan on December 3, 2018 is not even worth one penny.   This debt statement was created for one loan that was written off in 1983.  The principal amount owed is $0.01 and the interest accrued is $464.85  There could be no reason for reinstating this loan, because a write off, means totally discharged, not collectible. Pursuant to 34 CFR § 674.47 (h)(2)&(3) *"Write-offs of accounts...When the institution writes off an account, the borrower is relieved of all repayment obligations."*

45.  What a fool the plaintiff was, but her eyes are wide open now.  This was a fraud of a despicable nature pursuant to Code of Civ. Proc. § 3294(c)(3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the

17

intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

46. DRG refused to acknowledge that September 22, 2015 was 8 months past the 3-year post-monitoring discharge (PMD) date for the plaintiff, which ended officially on January 20, 2015. The DRG and Nelnet were not about to admit to the plaintiff that a "second" reinstatement of her loans had been done on December 3, 2018, four years past the 3-year PMD date, January 2015, and seven years after her TPD discharge in January 2012. Four years past the date the plaintiff gave her permission to the Department to be monitored financially.

47. The fraud and deceit kept the plaintiff from asking the Defendants for a legal reason for this December 2018 reinstatement because there is no legal reason.

48. The fraud and deceit cut down on the time the plaintiff had to object to the existence of this December 2018 debt before her SSA benefits were garnished. The plaintiff was not able to stop the garnishment, no matter how much proof and legal statutes were on her side. The Defendants were able to accomplish their objectives, which was garnishment, by acting like a runaway locomotive without brakes.

49. In the original complaint, filed September 8, 2021, the plaintiff was defending herself against the wrong reinstatement date. The plaintiff's complaint should be used to defend herself against the December 3, 2018 reinstatement. The September 22, 2015 reinstatement never went into collections and no notices were ever sent to the plaintiff; it was used as a distraction from the real reinstatement date.

50. The DRG was hiding the fact that they had been lying in wait and illegally monitoring the plaintiff and waiting for her SSDI benefits to be automatically converted to SSA Retirement benefits. The defendants made up September 22, 2015 as a reinstatement date because it was two weeks before the plaintiff's SSDI benefits were going to be blocked from the Treasury Offset Program (TOP), by a new law, effective October 6, 2015. In a memo from the US Treasury dated

18

October 6th 2015, Phyllis Brown, Director – Collection Inventory Delivery and Selection of the US Treasury announced a recent policy shift to exclude SSA disability insurance payments from the Federal Payment Levy Program (FPLP) effective for payouts after October 3rd 2015. This means that the disability portion of SSA benefits (SSDI) will be removed from the FPLP 15% Levy.  Also found at website https://www.irs.gov/irm/part5/irm_05-011-007r  - The IRS Collecting Process - This IRM information pertains to Automated levy programs and Federal Payment Levy Program (FPLP).   IRM 5.11.7.2.1.1 (9/23/2016) IRS/BFS Interagency Agreement - Federal Payments Subject to the FPLP (2)(e) Social Security Administration (SSA) benefit payments under Title II of the Social Security Act, aka Federal Old Age, Survivors and Disability Insurance (OASDI) benefits. (The exceptions are disability insurance payments, dependent child benefits, claims for lump sum payments, and payments that have partial withholding to repay an SSA benefit overpayment.)

51.   The reinstated loan status, DU, and the loan date, 9/22/2015, was placed on all of the plaintiff's records in the hopes that the defendants could garnish the plaintiff's SSA Retirement benefits later, like they actually did.  According to the FSA website:  https://studentaid.gov/manage-loans/default/collections.  **"If your Social Security disability benefits are being withheld, the withholding of those benefits will be suspended if the Social Security Administration (SSA) makes a determination that you are totally disabled, with medical improvement not expected. However, if the SSA later converts your disability benefits to retirement benefits, the withholding of your Social Security benefits may resume without notice"**

52.   That is exactly what the defendants did, the defendants sent no notices, they just sent FH Cann, then garnishment on May 3, 2019.  But this was illegal because the Defendants lied. **Nelnet and DRG claimed to "resume" a collection of the plaintiff's benefits that had never started.** Collection of the plaintiff's  SSDI benefit payments were terminated eleven (11) years ago, by the Secretary on November 3, 2011.  The Secretary discharged the plaintiff's loans due to TPD two

months later on January 20, 2012.   It doesn't matter that the plaintiff loans should still be classified as Defaulted/Then Disabled and there was no lawful reason to reinstate the plaintiff's loans on September 22, 2015.  No collections were started in 2015 (they would have been illegal) so there is nothing to "resume" without notice.

53.  The main reason for this deception is money, greed and inhumanity.  According to the DRG Payment History document for the plaintiff: May 3,  2019 - SSA Payment -$1,181.00,  First 15% offset payment - $177.00.  Nelnet and DRG received 92 percent, $164.03 as an interest payment, FHC received the other eight percent $13.12 for fees and zero dollars ($0) went toward the principal amount on the loans.  According to the plaintiff's SSA Form-1099 (see Exhibit 53) and DOE Form 1098-E Student Loan Interest Statement for 2019 (see Exhibit 58), Nelnet received $656.74 as interest payments from the plaintiff's four offset payments in 2019.

54.  The people who devised this scheme should have to serve some jail time, but I know that won't happen.  So I asked that they be punished by the court in any way the court sees fit.

**B. THE FRAUDULENT FINANCIAL REASON FOR SEPTEMBER 22, 2015 REINSTATEMENT**

55. The reason the Department's DRG has given for this garnishment is false, fraudulent, and an abuse of authority:  "Nelnet did not receive required financial information".

56.  On October 1, 2018, the plaintiff received a collection notice from FHC for $51,029.93.  This was the first time the plaintiff became aware that her loans were in default.  So the plaintiff responded to this collection notice by calling the telephone numbers listed on the notice and followed up with written documentation and proof disclaiming the fact that the plaintiff owes any money.

57.  According to DRG letters dated March 29, 2019 (see Exhibit 1) and July 19, 2019 (see

Exhibit 2) "The Nelnet Total and Permanent Disability Servicer previously approved your request for loan discharge due to total and permanent disability, and your student loans were discharged. On September 22, 2015, we received notification to reinstate your obligation to repay your discharged federal student loans because the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-discharge monitoring period. Therefore, the Department's Default Resolution Group resumed collection of this debt".

58. On January 25, 2021, an DRG letter states , "Because the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-discharge monitoring period, on January 1, 2015, your obligation to repay your discharged federal student loans was reinstated. Your loans were reassigned to the Department's Default Resolution Group, and collection of this debt resumed on September 22, 2015. Your account with the Department's Default Resolution Group is identified by account number 1002320370." (see Exhibit 3)

59. The plaintiff fulfilled her borrower's financial responsibilities as listed in 34 CFR § 682.402(c)(7)(ii-iii)  Borrower's responsibilities after a total and permanent disability discharge. During the three-year period described in paragraph (c)(6)(ii - iii) of this section, the borrower must - (ii) "Promptly notify the Secretary if the borrower's annual earnings from employment exceed the amount specified in paragraph (c)(6)(i)(A) of this section;"  (iii) "Provide the Secretary, upon request, with documentation of the borrower's annual earnings from employment, on a form approved by the Secretary". The plaintiff mailed the approved form to the Department's TPD Servicing address.

60. On May 29, 2013, "Nelnet Education Planning & Financing" (Nelnet Servicing, LLC) sent the plaintiff a letter requesting employment income information for the tax year 2012 (see Exhibit 14). "LOLA P THOMPSON, 1562 W 4TH ST. APT 204, LOS ANGELES, CA 90017-1277    Account Number: 256546,  Discharge Date: 3/1/2012

ACTION: Submit documentation of your employment income for the 2012 tax year(s) by

21

7/28/2013.   If you don't submit this information, payments may become due on your student loan or service obligation.   Dear LOLA P THOMPSON:  This letter contains important information about the U.S. Department of Education's (the Department) discharge of your Federally insured Student Loan or service obligation.  Your disability discharge application is currently in a three-year monitoring period. To continue the discharge process, you must provide annual documentation of your income. This documentation must prove that you have not received annual employment income that exceeds the Poverty Guideline amount for a family of two in your state of residence. We have provided your Poverty Guideline amount below. You must submit income information for each tax year of your three-year monitoring period. This letter is our official request for your income information for the 2012 tax year(s). You may submit any of the following as documented proof of income: Filed income tax return, with all attachments; Pay stubs showing year-to-date income; w2; or Social Security Statement.  The Poverty Guideline amount for a family of two in CALIFORNIA for 2012 is $15,130.00".

61.  On June 13, 2013, the Department's TPD Servicing received a copy of Form SSA-1099 Social Security Benefit Statement for the tax year 2012 listing $12,840 listed as the plaintiff's net benefits for the year.  A copy of this SSA-1099 document was sent to the plaintiff by the Department's DRG on January 25, 2021 as an enclosure with a received stamp on it dated 6-13-2013 (see Exhibit 20).

62.  On July 10, 2013, "Nelnet Education Planning & Financing" (Nelnet Servicing, LLC) sent the plaintiff a second letter requesting acceptable proof of employment income for the tax year 2012 - 2013 (see Exhibit 18).  The Form SSA-1099 that the plaintiff sent to Nelnet was not considered to be proof of income. The letter states:  "LOLA P THOMPSON, 1562 W 4TH ST, APT 204, LOS ANGELES, CA 90017-1277        Account Number: 256546  -  Discharge Date: 3/1/2012

ACTION NEEDED: Submit acceptable proof of employment income for the 2012 tax year(s) no

later than 09/08/2013. If you don't submit this information, payments may become due on your student loan or service obligation.

Dear LOLA P THOMPSON:   We recently received documentation of your annual employment income; however, we are unable to determine whether you meet the employment income requirement. The reason(s) we cannot evaluate your employment income and the necessary follow-up action(s) are: (1) The documentation you submitted was not a valid form of income verification. Action: If you did not earn income from employment for the  period starting 03/01/2012 and ending 03/01/2013, send a written statement signed by you or your representative indicating no income was earned...(2) We are unable to accept SSA-1099 as proof of income."

   63. On August 9, 2013, the plaintiff sent a signed and dated copy of approved Form OMB No. 1845-0065, Total and Permanent Disability Discharge: Post-Discharge Monitoring Form (see Exhibit 19) to U.S. Department of Education, TPD Servicing, P.O. Box 87130, Lincoln, NE 68501-7130 a month prior to the September 8, 2013 deadline.    "Item 1: Complete Item 2 based on the following period 03/01/2012 through 03/01/2013. Item 2: Did you have income earned from employment during the period described in Item 1- Answer: No.  By signing this form, you are certifying that you had no earned income from employment for the period described in item 1". This was Nelnet's only request for financial information during the three year monitoring period from January 20, 2012 to January 20, 2015.

   64. The statement by the Department's DRG that "the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-discharge monitoring period.   Therefore, the Department's Default Resolution Group resumed collection of this debt", is a false statement. A copy of this completed Form OMB signed by the plaintiff and dated August 9, 2013, was sent to the plaintiff by the Department's DRG on January 25, 2021 as an enclosure. This proves that the DRG and Nelnet are acting with malicious intent, fraud and oppression because they had this completed financial form in their possession and denied its

23

existence.

65.  This request for financial information can be obtained by the Secretary and his agents with the touch of a computer keystroke.  The secretary has access to IRS wage and tax income information.  So why does the Department and other servicing contractors need to get information from the borrower instead of the IRS.  Is it because they cannot wait until the income is displayed by the IRS, what could possibly be the reason?  Does a person have no rights to privacy?  The Department is allowing these servicing companies to get away with causing harm and financial hardship to people who do not deserve it.  These TPD borrowers, probably half or more are seniors, all of them are mentally and/or physically disabled, have broken no laws nor have income above the poverty guideline, yet a servicing agency can reinstate their loans simply because they did not send in a form or some other evidence of their current employment income, even if and when that amount is **zero** dollars,  their loans can be reinstated immediately.  The form could have gotten lost in the mail, the  borrower could have moved or it was returned a few days past the 30 day deadline for return of form.  There is too much room here for fraud by the contractors and DRG.  For example: Nelnet denies that they received the required OMB form that the plaintiff, Lola P. Thompson sent to them.  There is no reason that this requirement should exist because of Automatic Income Monitoring. This requirement should be removed, if it were a law it should be abolished, because that was not the intention of the reinstatement laws and regulations.

66.  The plaintiff gave her consent for Automatic Income Monitoring when she applied for TPD discharge.  The defendants had access to the plaintiff's tax and wage information any time they wanted to look at it, until the end of her 3-year post-discharge monitoring period.  According to 20 U.S. Code § 1098h -(a)(3)(B) Total and permanent disability.  In the case of any written or electronic application by an individual for a discharge of a loan under this subchapter based on total and permanent disability (within the meaning of section 1087(a) of this title) that requires income monitoring, the Secretary shall - (B) require, as a condition of eligibility for such discharge, that

such individual - (i) affirmatively approve the disclosure described in paragraph (1)(A)(i) and agree that such approval shall serve as an ongoing approval of such disclosure until the earlier of - (I) the date on which the individual elects to opt out of such disclosure under section 1087(a)(3)(A) of this title; or (II) the first day on which such loan may no longer be reinstated" The "first day" that the plaintiff's loans could no longer be reinstated was January 20, 2015, which is three (3) years after her TPD discharge date as per physician's signature on January 20, 2012.

67. Federal regulation 20 U.S. Code § 1087(a)(3)(A)(i)(i) "use return information disclosed under section 6103(l)(13) of title 26, pursuant to approval provided under section 1098h of this title, to determine the borrower's continued eligibility for the loan discharge described in subparagraph (B)" 26 U.S.C. § 6103(l)(13)B(i) Taxpayer identity information, (B)(ii) Filing status, (B)(vi) If applicable, the fact that there was no return filed.  And (C)(ii) The amount of any net earnings from self-employment, income from wages, and taxable income from a farming business.

68. The Secretary of the department and delegated agents were given access to the plaintiff's income information by the plaintiff when she applied for TPD discharge, pursuant to the statutes listed above.  Therefore they had access to all of the plaintiff's income information from employment and social security.

69. So why are the defendants lying?  Why is Nelnet Total and Permanent Disability Servicer claiming they did not receive required financial information during the 3-year post-discharge monitoring period.  Why are they claiming that not receiving required financial information is a reason to reinstate the plaintiff's loans?  If the plaintiff did not have a copy the OMB form, Nelnet and DRG would have been able to get away with a big lie and continue to take money and cause emotional and financial harm to a former 5-year homeless person, disadvantaged/poor, mentally and physically disabled, 72 year old, underprivileged black female who has had to file this complaint to stop this despicable action.

70. Nelnet being a contractor makes them a "person" in this Complaint pursuant to 31 U.S.

Code § 3801(a)(6) "person" means any individual, partnership, corporation, association, or private organization.  Nelnet sent the DOE, a United States Government Agency, false statements and fraudulent records which stated that the plaintiff's loans were reinstated by them on September 22, 2015 because Nelnet did not receive required financial information.  This was a false statement.

71.  If the statement had been true, it would have been a violation of 34 CFR § 682.402(c)(7)(iii)  Borrower's responsibilities after a total and permanent disability discharge. During the three-year period described in paragraph (c)(6)(ii - iii) of this section, the borrower must - ... (iii) "Provide the Secretary, upon request, with documentation of the borrower's annual earnings from employment, on a form approved by the Secretary".  But, the statement is false.  The plaintiff mailed the requested financial information on August 9, 2013, on the approved form to the Department's TPD Servicing address.

72.  Here knowingly requires no proof of specific intent to defraud.  Pursuant to statute 31 U.S. Code § 3801(a)(5) "knows or has reason to know", for purposes of establishing liability under section 3802, means that a person, with respect to a claim or statement— (A) has actual knowledge that the claim or statement is false, fictitious, or fraudulent;  (B) acts in deliberate ignorance of the truth or falsity of the claim or statement; or (C) acts in reckless disregard of the truth or falsity of the claim or statement, and no proof of specific intent to defraud is required.

73. Pursuant to CA Civ Code § 1710(2)  A deceit, within the meaning of the last section, is the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.  Both, the Department's DRG and Nelnet, are guilty of deceit, fraud, malice and oppression by denying the existence of the  Form OMB No. 1845-0065, TPD Discharge: Post-Discharge Monitoring Form  submitted by the plaintiff to fulfill Nelnet's request for information on income from employment in 2012 to 2013 on August 9, 2013.

Complaint for Injunctive and Declaratory Relief from Garnishment
EXHIBIT 1

74. Pursuant to Code of Civ. Proc. § 3294 - (a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

75. Code of Civ. Proc. § 3294(c) As used in this section, the following definitions shall apply: (1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. (2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

76. 34 CFR § 682.402 (Death, disability)(c)(6) (i)(A) (Conditions for reinstatement of a loan after a total and permanent disability discharge) the borrower -  (A) Has annual earnings from employment that exceed 100 percent of the poverty guideline for a family of two, as published annually by the U.S. Department of HHS pursuant to 42 U.S.C. 9902(2).

77. 20 U.S.C. § 1087 If a student borrower...dies or becomes permanently and totally disabled.... the Secretary may promulgate regulations to reinstate the obligation of, and resume collection on, loans discharged under this subsection in any case in which— (A) a borrower received a discharge of liability under this subsection and after the discharge the borrower—(i) receives a loan made, insured, or guaranteed under this subchapter; or (ii) has earned income in excess of the poverty line.

78. The plaintiff's income from Social Security Disability Benefits was below the poverty guideline during the 3-year post-discharge monitoring period (PMD).  See four SSA-1099 Benefit Statements from the IRS (see Exhibit 21) and four statements from the Social Security

Administration (see Exhibit 21a).  The plaintiff's earnings from 2012 - 2015 was  $12,840 -

$13,476 which was below the Poverty Guideline for two in 2015, $15,930 .

79.  The plaintiff was receiving Social Security Disability Insurance Benefits during the

entire monitoring period.  Which means the plaintiff had been declared totally and permanently

disabled by two agencies, SSA and DOE for the same time frame and living below the poverty

guideline.  I would say that there was no doubt that the plaintiff was total and permanently disabled,

both mentally and physically.  So why are her benefits being garnished?  Why is the Department's

DRG defending Nelnet when they have proof that Nelnet is lying.  This is deceit, fraud, malice and

oppression.  There are no legal justifications for this garnishment, no financial reasons.  This shows

malicious intent to do financial and emotional harm to the plaintiff with this garnishment.


**C.   THREE FRAUDULENT, ARBITRARY REINSTATEMENT DATES**

**(1)  DECEMBER 3, 2018  - FRAUDULENT, ILLEGAL, ARBITRARY
REINSTATEMENT DATE**

**(a)  ILLEGAL COLLECTIONS**

80.  According to FSA at website:  https://studentaid.gov/manage-loans/default/collections

"Before a defaulted loan is placed with a private collection agency, ED will explain what you can do

to avoid both the assignment to a private collection agency and the reporting of default status to

credit agencies.  If you do not enter into a repayment agreement for your defaulted federal student

loans, ED will refer your loans to a private collection agency. Private collection agencies earn a

commission for any payments you make on loans that ED has referred for collection. When you

make a payment, the payment is first applied to the collection cost we charge (17.92% of your

outstanding balance due), with the remainder of the payment being applied to interest and principal

on your loan.  For the loans that it owns, ED currently contracts with the collection agencies that are

identified below: FH Cann & Associates P.O. Box 877  North Andover, MA 018451-877-677-

9126"

81. On October 1, 2018 FHC sent the plaintiff a Collection Letter with ten Defaulted Education Loans for Account No. 1002320370 (see Exhibit 10). The defaulted loans are identical to the education loans on the Debt Statement sent two months later on December 4, 2018. The order that these documents were sent to the plaintiff was illegal according to FSA's statement above. A Debt Statement has to be sent notifying the plaintiff that her loans are in default. Then FHC, the collection agency, has to wait at least 65 days after the December 4, 2018 Debt Statement before sending collection notices. According to the Debt Statement "To avoid Treasury offset, you must agree to pay the debt under terms accepted by the Department, and must actually make the first payment under the agreement within 65 days of the date of the Debt Statement and continue to make timely payments". And also pursuant to 34 CFR § 682.402(c)(6)(iii)(B) An explanation that the first payment due date on the loan following reinstatement will be "no earlier than 60 days after the date of the notification of reinstatement".

82. Instead of waiting 60 days after the Debt Statement was issued, which would be February 4, 2019, FHC sent Collection notices MUCH too early on October 1, 2018, accruing interest charges and fees illegally pursuant to 34 CFR § 682.402(c)(6)(ii)(C) "If the borrower's obligation to repay a loan is reinstated, the Secretary - Does not require the borrower to pay interest on the loan for the period from the date the loan was discharged until the date the borrower's obligation to repay the loan was reinstated." FHC started charging interest on October 1, 2018, two months before the loan was reinstated on December 3, 2018 and not giving the plaintiff the 65 day grace period after reinstatement.

83. The early collections gave the plaintiff little to no time to object to this debt. FHC came in like a locomotive train going downhill with no brakes. No objections from the plaintiff about the unlawful and illegal nature of this garnishment was going to stop this runaway train.

84.   No Reinstatement notices were sent to the plaintiff by the Secretary before this

December 4, 2018 Debt Statement was created.  Pursuant to 34 CFR § 682.402(c)(6)(ii)(A) & (B)

(ii) If the borrower's obligation to repay a loan is reinstated, the Secretary - (A) Notifies

the borrower that the borrower's obligation to repay the loan has been reinstated;   Not notifying the

plaintiff about this reinstatement is Fraud by concealment pursuant to Code of Civil Procedure §

3294(c)(3)  "Fraud" means an intentional misrepresentation, deceit, or concealment of a material

fact known to the defendant with the intention on the part of the defendant of thereby depriving a

person of property or legal rights or otherwise causing injury.

### (b)  ILLEGAL DEBT - ONE-CENT ($0.01)

85.   We know that collections by FHC were illegal now let's look at the plaintiff's illegal,

fraudulent debt.  According to FHC, the plaintiff's loans are listed on the Account Detail for

Account No. 1002320370 included as page 2 of their October 1, 2018 Collection notice (see below:)

### FHC Account Detail - Account No. 1002320370

| FHC# | Client Reference# | Principal | Interest | Fees/ Costs | Total Balance |
|---|---|---|---|---|---|
| **1639878** | **7014878** | **0.01** | **464.85** | **113.15** | **578.01** |
| 1639879 | 7014891 | 2,457.21 | 3,339.02 | 1,410.80 | 7,207.03 |
| 1639880 | 7014903 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1639881 | 7014917 | 1,648.27 | 2,272.19 | 954.24 | 4,874.70 |
| 1639882 | 7015027 | 1,674.02 | 2,274.81 | 961.14 | 4,909.97 |
| 1639883 | 7015036 | 2,791.28 | 3,795.06 | 1,603.12 | 8,189.46 |
| 1639884 | 7015049 | 3,244.95 | 6,557.46 | 2,385.91 | 12,188.32 |
| 1639885 | 7015061 | 2,649.74 | 3,595.17 | 1,520.01 | 7,764.92 |
| 1639886 | 7015074 | 0.01 | 0.00 | 0.00 | 0.01 |
| 1639887 | 7015090 | 1,808.02 | 2,468.57 | 1,040.92 | 5,317.51 |
| | Loans | Principal | Interest | Fees | Total |
| FHC Totals | 10 | $16,273.51 | $24,767.13 | $9,989.29 | $51,029.93 |

86.   The plaintiff had 7 loans at NMIMT from 1983 to 1986.  FHC had copies of Promissory

Notes for five of the New Mexico student loans (see exhibit 51) that have an interest rate of 9%.

There were no Promissory notes for two of the loans, rather an Indemnification Agreement for the

30

Assignment of a FFEL "Lost" Promissory Note. No interest rate was shown on the Indemnification Agreements, but the plaintiff knows that the 9% rate was used. This high interest rate on the plaintiff's loans is the main reason why the defendants want the plaintiff to be in default so badly that they would commit fraud to accomplish this illegal collection. The current interest rate is 3.73% for an undergraduate, but the defendants can and did charge 9% on the plaintiff's loans.

87. FHC has no paperwork for the plaintiff's three loans at Globe college of Business from 1982 to 1983 because all three of those loans were Written Off in 1993 and 1999. This makes it illegal to collect these loans because there is no proof that they exist. However, the Globe loans are still listed and computed into the total amount on the plaintiff's database file in the NSLDS. Clearly FHC had no proof that these loans exist, because they had been written off. So FHC had no legal right to charge $113.15 in collection cost on a loan that had been written off, and had a principal amount of one cent ($0.01). It had a fraudulent interest amount of $464.85. FHC wants to collect the total balance, $578.01, on a one cent, written-off, canceled loan. This is beyond ridiculous, it is despicable and definitely illegal. This was a false claim that was submitted to the plaintiff and to TOP for collection.

88. This is a quote from the plaintiff's Answer to Nelnet Servicing, LLC's Demurrer "The plaintiff's loans are so old, 1982 to 1986, FHC is probably using old, old illegal rates. This is a probable reason, huge interest rates, why the plaintiff's loans are so appealing to FHC and Nelnet, this is only a guess on the plaintiff's part, not a statement of fact."

89. The plaintiff can now say, without guessing and with proof written on the Plaintiff's Promissory Notes from New Mexico Student Loan Guarantee Corporation (NMSLGC) that the interest rate is 9%. According to page 2 on all five of the plaintiff's signed Promissory notes from NMSLGC: "Disability or Death - If I become totally and permanently disabled or if I die my obligation to pay any amount owed under this loan will be canceled." See below a Promissory Note for $2,116.00, signed by the plaintiff, Lola P. Thompson, on July 9, 1984. (Exhibit 52):

31



90.  As you can see below the disbursement dates of the Globe loans are 39 and 40 years ago and the status of the loans was DW, DEFAULTED, WRITE-OFF forty years ago.  Nine (9) percent was the official DOE loan rate for 1982 and 1983, the exact years of which the plaintiff's three Globe Loans were disbursed.   FHC was able to charge 9% interest on all of the plaintiff's loans. Loans from Globe College of Business as they are currently listed by FHC and DOE:

| Status of Loan | Loan Status Date | Education Institution | Loan Amount | Total Amount Applied | Applied to Principal | Applied to Interest | Applied to Fees | First Disburse Date |
|---|---|---|---|---|---|---|---|---|
| DW | 04/02/1993 | Globe U | $1,000.00 | $464.86 | $0.01 | $464.85 | $0.00 | 06/22/1982 |
| DW | 04/02/1993 | Globe U | $2,500.00 | $0.01 | $0.01 | $0.00 | $0.00 | 01/25/1983 |
| DW | 12/2/1999 | Globe U | $1,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 04/27/1982 |

Loan Status: DW, Loan Status Description:  DEFAULTED, WRITE-OFF

91.  Pursuant to 34 CFR § 674.47 (h)(2)&(3) (Costs chargeable to the Fund). "*Write-offs of accounts.*  An institution that writes off an account under this paragraph may no longer include the amount of the account as an asset of the Fund.  When the institution writes off an account, the borrower is relieved of all repayment obligations.*"  This makes the one-cent debt illegal.

32

**(c) ONE-CENT WAS USED TO CREATE A FRAUDULENT DEBT STATEMENT**

92.   The other despicable and outrageous thing about the loan for this debt is the fact that this loan was used to create this December 4, 2018 Debt Statement.  This loan was written off on April 2, 1993.  There is no paperwork that proves the loan exists, it was discharged, therefore you cannot collect on it.  The principal amount of the loan is one cent ($0.01).  What is there to collect? The Defendants deceived the Treasury Offset Program (TOP) when they presented this written-off loan for collections and then added all of the plaintiff's seven TPD discharged loans to the debt, pursuant to CA Civ Code § 1710(2)  A deceit, within the meaning of the last section, is the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.  The Defendants submitted false claims to a government agency.

93.   According to the December 4, 2018 Debt Statement sent to the plaintiff one cent ($0.01) is the current principal and the interest is $464.85.  This is the only **"debt covered"** by this notice.

**"Debts covered by this notice.**
**Note: balances shown on this notice are as of November 28, 2018.**

| Debt Number | School | Original Amount and Date | Prior Debt Holder | Current Principal | Current Interest |
|---|---|---|---|---|---|
| 7014878 | GLOBE UNIVERSITY | $1,000.00 06/22/1982 | Total and Permanent Disability Servicer | $0.01 | $464.85 |

**Additional Defaulted Debts Held by the U.S. Department of Education**
The U.S. Department of Education holds the following additional defaulted debts for which you were previously sent notice. These debts may have already been referred for offset, as explained in prior notices."(7 NMIMT loans)

94.   According to the U.S. Department of the Treasury, Bureau of Fiscal Service, what an agency must do before it submits a claim to TOP for offset is found at https://fiscal.treasury.gov/top/how-top-works.html.  **"What happens before agencies send debts to TOP?** The law requires agencies to send debts to TOP when the debt is 120 days overdue.  The agency must make sure the debt is valid and legally enforceable."

95.   The Defendants think that the scheme they devised, sending a false, fraudulent Debt

Statement dated December by 4, 2018 means the illegal, false, phony debt is overdue for 120 days on February 4, 2019.   February 4th is one month before the plaintiff received her first notice from the Treasury attempting to collect this fraudulent debt.  On March 1, 2019, TOP sent the plaintiff a notice  announcing it would garnish the plaintiff's SSA benefits no sooner than May 2, 2019, if the debt is not paid by then. (see Exhibit 55).

96. The Defendants failed  the TOP requirement that "the debt is valid and legally enforceable".  The Department made false claims to TOP,  a government agency.  A false debt for one penny ($0.01), that had been written off on April 2, 1993 was submitted to TOP for offset payments with a total balance of $55, 198.00.  The total balance includes the full amounts of 3 loans that were written off and 7 loans that had been discharged by the Secretary due to TPD on January 20, 2012. This was a false claim, a deceit.  Pursuant to CA Civ Code § 1710(2)  A deceit, within the meaning of the last section, is the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

97. Pursuant to 31 U.S. Code § 3801(a)(6) "person" means any individual, partnership, corporation, association, or private organization. 31 U.S. Code § 3801(a)(5) "knows or has reason to know", for purposes of establishing liability under section 3802, means that a person, with respect to a claim or statement— (A) has actual knowledge that the claim or statement is false, fictitious, or fraudulent;  (B) acts in deliberate ignorance of the truth or falsity of the claim or statement; or (C) acts in reckless disregard of the truth or falsity of the claim or statement, and no proof of specific intent to defraud is required;  31 U.S. Code § 3801(a)(3)(A)  "claim" means any request, demand, or submission— made to an authority for property, services, or money (including money representing grants, loans, insurance, or benefits).

98.  The Department, Nelnet and FHC submitted false claims to a government agency, namely the IRS and TOP.  Liability attaches pursuant  to 31 U.S. Code § 3802 - False claims and statements; liability (a)(2) Any person who makes, presents, or submits, or causes to be made,

34

presented, or submitted, a written statement that— (A)(i) the person knows or has reason to know—asserts a material fact which is false, fictitious, or fraudulent;  and (C) contains or is accompanied by an express certification or affirmation of the truthfulness and accuracy of the contents of the statement, shall be subject to, in addition to any other remedy that may be prescribed by law, a civil penalty of not more than $5,000 for each such statement.

99. The interest rate today according to FSA at https://studentaid.gov/understand-aid/types/loans/interest-rates  Perkins Loans (regardless of the first disbursement date) have a fixed interest rate of 5%. Interest Rates for Direct Loans First Disbursed on or After July 1, 2021, and Before July 1, 2022:

| Loan Type | Borrower Type | Fixed Interest Rate |
| --- | --- | --- |
| Direct Subsidized Loans and Direct Unsubsidized Loans | Undergraduate | **3.73%** |
| Direct Unsubsidized Loans | Graduate or Professional | **5.28%** |
| Direct PLUS Loans | Parents and Graduate or Professional Students | **6.28%** |

100. After viewing the current and most recent years interest rates, the plaintiff's knows that the high, 9% interest rate on her 40 year old loans, her status as a poor, physically disabled, elderly, black, female senior citizen collecting SSA benefits, who had previously collected SSDI, made her a target and easy prey for these predatory Defendants.  She was profiled because she had no ability to defend herself except by coming to this court and asking the judge and a jury for help, otherwise this garnishment will continue until the death of the plaintiff, because of the high interest rates and capitalization.  How many people have my profile?  How many are there?

## (2) SEPTEMBER 22, 2015 - FRAUDULENT, ILLEGAL, ARBITRARY REINSTATEMENT DATE

101. No notices were ever sent to the plaintiff for the September 22, 2015 Reinstatement date during the year 2015.   No reinstatement notices were sent to the plaintiff in 2016, 2017, 2018, 2019, 2020 or 2021.  A Debt Statement for this September 22 Reinstatement Date was finally sent to the plaintiff on January 25, 2021,  as an enclosure in a package with several other documents from the Department's DRG.  The Debt Statement was dated September 23, 2015.  The disclosure of this Debt Statement was six years after the reinstatement date.  Since the defendants never acted in 2015 on this false claim that the plaintiff's loans were reinstated on September 22, 2015, this fraudulent claim has become moot.  The reinstatement date that is relevant for the plaintiff's current garnishment is December 3, 2015.

102. According to the Department's DRG letters dated March 29, 2019 (see Exhibit 1) and July 19, 2019 (see Exhibit 2)  "The Nelnet Total and Permanent Disability Servicer previously approved your request for loan discharge due to total and permanent disability, and your student loans were discharged. On September 22, 2015, we received notification to reinstate your obligation to repay your discharged federal student loans because the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-monitoring discharge period. Therefore, the Department's Default Resolution Group resumed collection of this debt".

103. Pursuant to 34 CFR § 682.402(Death, disability)(c)(3)(i)(A) Secretary's review of total and permanent disability discharge application. As of the date the physician certified the borrower's application. January 20, 2012  is the date her  physician, Dr. Thomas Early signed her TPD discharge application  (see Exhibit 12) which is the begin-date for the 3-year post-monitoring discharge period.

104. According to 34 CFR § 682.402(Death, disability)(c)(6) Conditions for reinstatement of a loan after a total and permanent disability discharge. (i) The Secretary reinstates the borrower's

obligation to repay a loan that was discharged in accordance with paragraph (c)(3)(iii) of this section if, within three years after the date the Secretary granted the discharge". The plaintiff's three-year monitoring period ended on  January 20, 2015, not September 22, 2015, eight months past the 3-year post-monitoring discharge period.

105. According to 20 U.S.C. § 1087 Repayment by Secretary of loans of bankrupt, deceased, or disabled borrowers. (a)(3)(B) Applicability.  Subparagraph (A) shall apply - (i) to each borrower of a loan that is discharged due to the total and permanent disability (within the meaning of this subsection) of the borrower; and (ii) during the period beginning on the date on which such loan is so discharged and ending on the first day on which such loan may no longer be reinstated. The plaintiff's loans were discharged on January 20, 2012 and the first day on which such loan may no longer be reinstated is January 20, 2015.  However, September 22, 2015 is the fraudulent date on the plaintiff's records in the NSLDS.

106. September 22, 2015 is not the fraudulent, arbitrary, capricious and illegal reinstatement date being used for garnishment of the plaintiff's SSA benefits.   December 3, 2018 is the most recent reinstatement date.  The Reinstatement status of ten of the twelve plaintiff's loans is listed on the NSLDS records as "DEFAULTED, UNRESOLVED" with a Loan Status effective date September 22, 2015.

107. 20 U.S.C. § 1098h Procedure and requirements for requesting tax return information from the Internal Revenue Service. (a) Notification and approval requirements (a)(3)(B)(i)(II) (3) Total and permanent disability.  In the case of any written or electronic application by an individual for a discharge of a loan under this subchapter based on total and permanent disability  (B) require, as a condition of eligibility for such discharge, that such individual - (i) affirmatively approve the disclosure described in paragraph (1)(A)(i) and agree that such approval shall serve as an ongoing approval of such disclosure until the earlier of—(I)...; or (II)the first day on which such loan may no longer be reinstated.   Again that date is January 20, 2015, not September 22, 2015.

Complaint for Injunctive and Declaratory Relief from Garnishment
EXHIBIT 1

108.  On September 23, 2015, two debt statements were created. Nine (9) of the plaintiff's FFEL loans were declared to be in default (see Exhibit 22) and (see Exhibit 23). The plaintiff's obligation to repay her loans had been reinstated and a 60 days notice to repay the loan was given. The notices state "The U.S. Department of Education (the Department) now holds the defaulted student loan(s) for which you are responsible. The entire outstanding balance for the loan(s) is now due... To avoid the Department reporting this loan to the credit bureaus as in default, you have 60 days from the date of this letter to repay this loan in full, make satisfactory arrangements to repay and actually make the first payment under this arrangement".

109.  The U.S. Department of Education sent the DRG two debt statements which contain a total of nine FFEL loans for Account No. 1002320370. Lola P. Thompson, 1562 W. 4th Street Apt 204, Los Angeles, CA 90017.

| Due Date 09/23/2015 | No. Loans | Principal Balance | Interest | Fees | Total Balance |
|---|---|---|---|---|---|
| Letter No. 1 | 7 | $12,951.22 | $16,696.96 | $0.00 | $29,648.18 |
| Letter No. 2 | 2 | $ 3,322.29 | $ 3,643.28 | $0.00 | $ 6,965.57 |
| Totals | 9 | $16,273.51 | $20,340.24 | $0.00 | $36,613.75 |

110.  "The U.S. Department of Education (the Department) now holds the defaulted student loan(s) for which you are responsible. The entire outstanding balance for the loan(s) is now due. You will also be liable for the costs of collecting the loan(s). These charges can add substantially to the amount needed to satisfy your debt."

111.  "Failure on your part to repay your debt may result in the Department moving against you with one or all of the following collection measures: (1) We can refer your debt to a collection agency, and charge you the costs incurred by the Department in having that agency collect the debt(s). These costs are currently up to 25% of the principal and interest owed on your loan. The

Department applies any payments you make first to these costs, and then to your loan balance. This will increase the cost to you of paying off your loan by up to 25%. (2) We can refer your debt to the Department of the Treasury for offset of Federal and/or State payments due you (including your

112. "To avoid the Department reporting this loan to the credit bureaus as in default, you have 60 days from the date of this letter to repay this loan in full, make satisfactory arrangements to repay and actually make the first payment under this arrangement, or to request an administrative review. For more information about student loans, visit the Department's Web site at www.myeddebt.com."

113. The two debt statements dated September 23, 2015 for Account No. 1002320370 - Lola P. Thompson, are proof positive that the plaintiff's loans were reinstated eight months past the January 20, 2015 end-date for the 3-year post-monitoring discharge period. This is very fraudulent and unlawful.

114. No attempts to collect on this reinstatement date, September 22, 2015, were ever made, so this reinstatement date is moot. This was an attempt to deceive the plaintiff, by misrepresenting the real reinstatement date of this garnishment, December 3, 2018, not September 22, 2015.

### (3) JANUARY 1, 2015 - FRAUDULENT, ILLEGAL, ARBITRARY REINSTATEMENT DATE

115. On January 25, 2021, DRG sent the plaintiff a letter in which the Department is trying to change the reinstatement date from September 22, 2015 to January 1, 2015, stating "Because the Nelnet Total and Permanent Disability Servicer did not receive required financial information during the 3-year post-discharge monitoring period, on January 1, 2015, your obligation to repay your discharged federal student loans was reinstated. Your loans were reassigned to the Department's Default Resolution Group, and collection of this debt resumed on September 22, 2015". (see Exhibit 1)

116.   Pursuant to 34 CFR § 682.402(c)(6)(ii)(A) & (B) (ii) If the borrower's obligation to repay a loan is reinstated, the Secretary - (A) Notifies the borrower that the borrower's obligation to repay the loan has been reinstated; (B) Returns the loan to the status that would have existed if the total and permanent disability discharge application had not been received.

117.   No notices were ever sent to the plaintiff for the January 1, 2015 Reinstatement date during the year 2015.   No reinstatement notices were sent to the plaintiff in 2016, 2017, 2018, 2019, 2020 or 2021.  There was no Debt Statement Notification on January 2, 2015, a legal requirement.

118.   The status of the plaintiff's loans were not changed from  DU-Defaulted, Unresolved on January 1, 2015 on any of her education loan records in the NSLDS database file.

119.   In two previous letters to the plaintiff, DRG gave only one date, September 22, 2015, as the reinstatement date they received from Nelnet, DRG letters dated July 19, 2019 (see Exhibit 2) and March 29, 2019 (see Exhibit 3).  There was no mention of the date January 1, 2015.

120.   This January 1, 2015 reinstatement date would put a stop to the plaintiff's complaint that the reinstatement date is past the 3-year post-discharge monitoring period.  This new date would fall within the three-year monitoring period.  This is an obvious attempt by the defendants to change one fraudulent, capricious, arbitrary date, September 22, 2015, to another fraudulent, capricious, arbitrary date, January 1, 2015.  Both dates are fraudulent, therefore there is no legitimate reason for the reinstatement of the plaintiff's education loans.

121.   No attempts to collect on this reinstatement date, January 1, 2015,  were ever made, so this reinstatement date is moot.  This was also another attempt to deceive the plaintiff, by misrepresenting the real reinstatement date of this garnishment, December 3, 2018, not January 1, 2015.

122.   Why does Nelnet and the Department's DRG think they don't have to follow federal regulations?  This is malice, fraud and oppression.  Code of Civil Procedure § 3294(c) As used in this section, the following definitions shall apply: (1) "Malice" means conduct which is intended by

the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.

(2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.  (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

### D.   TWO FRAUDULENT TPD DISCHARGE DATES  AND TOO MANY ACCOUNT NUMBERS

123.  The plaintiff has received correspondence from the Department, DRG and Nelnet with many different TPD discharge dates, two of the dates listed here are fraudulent and unlawful.

| Item No. | Date | Account No. | Status |
| --- | --- | --- | --- |
| (1) | JAN. 20, 2012 | 1002320370 | OFFICIAL TPD |
| (2) | MARCH 1, 2012 | 256546 | FRAUDULENT TPD |
| (3) | MAY 9, 2013 | E856039679 | FRAUDULENT ACCT |

### (1) JANUARY 20, 2012  - OFFICIAL TPD DISCHARGE ACCOUNT NO. 1002320370

124.  In 34 CFR § 682.402(c)(3)(i)(A) Secretary's review of total and permanent disability discharge application.  (i) If, after reviewing the borrower's completed application, the Secretary determines that the physician's certification... supports the conclusion that the borrower is totally and permanently disabled, as described in paragraph (1) of the definition of that term in § 682.200(b), the borrower is considered totally and permanently disabled - (A) As of the date the physician certified the borrower's application; or (B) As of the date the Secretary received the SSA notice of award for SSDI or SSI benefits.

125.  On December 8, 2011 the plaintiff received a letter and a TPD discharge application

41

(see Exhibit 11) from Account Control Technology, Inc. (ACT) a Total and Permanent Disability Servicer and Collection Agency.   The plaintiff returned the TPD application to ACT on January 20, 2012 the date that the plaintiff's physician, Dr. Thomas Early signed and certified her application. (see Exhibit 12).  The plaintiff's  loans were discharged by the Secretary on January 20, 2012.  The Disabled status of ten of the twelve plaintiff's loans is listed on the plaintiff's database file in the NSLDS as "DEFAULTED, THEN DISABLED"  with a loan status effective date January 20, 2012. Access can be obtained by logging onto the plaintiff's Loan Account No. 1002320370, on FSA's website, https://studentaid.gov or https://nslds.ed.gov to access the NSLDS.

### (2)  MARCH 1, 2012 -  FRAUDULENT TPD DISCHARGE  -  ACCOUNT NO. 256546

126.  On May 29, 2013, the defendant, Nelnet, sent the plaintiff a Total and Permanent Disability Discharge Letter more than a year after the discharge date, declaring March 1, 2012 to be the plaintiff's TPD discharge date, "LOLA P THOMPSON, 1562 W 4TH ST, APT 204, LOS ANGELES, CA 90017-1277       Account Number: 256546       Dear LOLA P THOMPSON:  The U.S. Department of Education (the Department) has completed its review of your application for a total and permanent disability discharge of your Federal Family Education Loan (FFEL) Program...service obligation.  The Department has discharged your loan on the basis of your total and permanent disability.  ...  However, the discharged loan will be reinstated if you do not meet certain requirements during a post-discharge monitoring period that will be in effect for three years from discharge date Mar 1, 2012."  (see Exhibit 13)

127.  This is so illegal.  This is an abuse of power and discretion by the Department and Nelnet, thinking that they can make up a fraudulent, arbitrary TPD discharge date, March 1, 2012. The defendants intentionally and willfully ignored the physician certification regulation that is found in 34 CFR § 682.402(c)(3)(i)(A).  This is intentional fraud.

128.  Nelnet intentionally ignored the fact that the plaintiff's loans had been discharged by the Secretary on January 20, 2012 due to TPD, eleven months prior to the transfer of her loans to the servicer, Nelnet, on November 7, 2012.

**(3) MAY 9, 2013  -  FRAUDULENT TPD DISCHARGE  -  ACCOUNT NO. E856039679**

129.  FSA regulations about servicer accounts is on the website https://studentaid.gov/help-center/answers/  "...You should have one student loan account number per loan servicer." Nelnet created two different account numbers for the plaintiff with two different TPD discharge dates, March 1, 2012 and May 9, 2013.   Both discharge letters were sent to the plaintiff at her current address in 2013.

130.  Account No. E856039679  is fraudulent and illegal.  This account was created by Nelnet and discharged due to TPD on May 9, 2013.  Nelnet used the plaintiff's name, address, social security number and nine of her loans on this fraudulent account.  The legitimate Nelnet account number for the plaintiff is Account No. 256546, the mirror of her ED Account No. 1002320370.

131.  On June 11, 2013, Nelnet sent the plaintiff a TPD Discharge Letter (see Exhibit 16), which states "Account Number: E856039679, Dear LOLA THOMPSON, As explained in a previous letter, on 05/09/2013, the U.S. Department of Education (the Department) discharged your Federal Family Education Loan (FFEL) Program... loan on the basis of your total and permanent disability. Throughout this letter, we use the term "loan" to refer to one or more loans.  We have determined that one or more payments were made on your loan after the date your physician certified your total and permanent disability discharge application.  Because your loan has been discharged, we will return these payments to the person who made the payments (see Exhibit 30). This process can take up to three weeks to complete.  As you are aware from our previous letter, a post-discharge monitoring period is in effect for three years from the discharge date, 05/09/2013.  If

at any time during or at the end of the three-year monitoring period you do not meet any of the conditions outlined in our previous letter, your loan will be reinstated."

132.  On June 12, 2013 a refund check was sent to the plaintiff $464.85 (see Exhibit 30). This is the exact amount paid on this account E856039679 on November 6, 2012, see below.  "We have determined that one or more payments were made on your loan after the date your physician certified your total and permanent disability discharge application."

133.  On February 27, 2020  the plaintiff logged onto the Nelnet website at www.nelnet.com, using her social security number.  The plaintiff was surprised to find that nine of her loans from Globe U and NMIMT had been paid off (see Exhibit 17).   The one and only Nelnet account listed for the plaintiff had the following information:   "LOLA P THOMPSON, 1562 W 4TH ST APT 204, LOS ANGELES, CA, 90017-1277   Account(s):  E856039679        Dear LOLA P THOMPSON:    The following detailed information pertains to your loan(s) at Nelnet:

Regular monthly payment amount $0.00     Past due amount $0.00       Due date  n/a
Capitalized interest $0.00       Outstanding principal balance $0.00
Accrued interest $0.00          Outstanding fees. $0.00        Current balance $0.00

| Payment Date | Payment Amount | Applied to Principal | Applied to Interest | Applied to Fees |
|---|---|---|---|---|
| 07/08/2015 | $36,300.97 | $16,273.51 | $20,027.46 | $0.00 |
| 11/06/2012 | $464.85 | $464.85 | $0.00 | $0.00 |
| Total Payment Amount | $36,765.82 | $16,738.36 | $20,027.46 | $0.00 |

| | Loans | Total | Principal | Interest | Fees |
|---|---|---|---|---|---|
| E856039679 | 9 | $36,765.82 | $16,738.36 | $20,027.46 | $0.00 |

134.  The loans listed above for Account No. E856039679 are identical to the loans for the plaintiff on her Education Account No. 1002320370.  The principal amounts are the same and the loans were paid off in full on July 8, 2015 with a payment of $36,300.97.

**E.   THE DEFENDANTS ARE DEMANDING THAT THE PLAINTIFF LIE ON HERSELF AND FALSIFY A NEW TPD DISCHARGE APPLICATION AS THE ONLY WAY TO END THIS NEVER ENDING GARNISHMENT**

135.  If the plaintiff were to apply for a second TPD discharge that would be tantamount to lying on her own self.  The plaintiff would be saying she is a borrower with Title IV loans that are in default.  The plaintiff would be lying, if she said that she has a debt with loans that are in default.  The plaintiff would be lying if she said she wants DOE to discharge a debt due to TPD.   The plaintiff's loans were already discharged due to TPD on January 20, 2012.

136.  The Defendants are demanding that the plaintiff help them illegally take her own money and help them defraud the Department of Education and submit false claims to the Treasury Department.  This is worse than being sadistic, taking pleasure in the infliction of pain, punishment, or humiliation on others.  They want the plaintiff to say that she owes a debt that she does not owe.  This debt would make the plaintiff liable for discharged loans that currently total $55,198.00.

137.  Loans from the plaintiff's NSLDS database file (see Exhibit 38).

| STATUS Effective Date | Status | Education Institution | Loan Amount | Outstanding Principal | Outstanding Interest | Loan Date | Disbursement Date |
|---|---|---|---|---|---|---|---|
| 1/20/2012 | DS | NMIMT1 | $2,500.00 | $3,245.00 | $7,512.00 | 09/09/1986 | 10/02/1986 |
| 1/20/2012 | DS | NMIMT2 | $1,635.00 | $1,808.00 | $3,028.00 | 06/11/1985 | 07/18/1985 |
| 1/20/2012 | DS | NMIMT3 | $2,404.00 | $2,791.00 | $4,003.00 | 06/18/1985 | 06/21/1985 |
| 1/20/2012 | DS | NMIMT4 | $1,442.00 | $1,674.00 | $2,400.00 | 08/28/1984 | 01/07/1985 |
| 1/20/2012 | DS | NMIMT5 | $1,442.00 | $1,648.00 | $2,394.00 | 07/26/1984 | 08/20/1984 |
| 1/20/2012 | DS | NMIMT6 | $2,116.00 | $2,457.00 | $3,522.00 | 05/31/1984 | 07/09/1984 |
| 1/20/2012 | DS | NMIMT7 | $2,500.00 | $2,650.00 | $3,793.00 | 08/05/1983 | 08/23/1983 |
| 4/02/1993 | DW* | Globe8 | $2,500.00 | $2,631.00 | $2,907.00 | 12/16/1982 | 01/25/1983 |
| 4/02/1993 | DW* | Globe9 | $1,000.00 | $1,052.00 | $1,617.00 | 05/11/1982 | 06/22/1982 |
| 12/2/1999 | DW* | Globe10 | $1,500.00 | $1,578.00 | $2,488.00 | 04/05/1982 | 04/27/1982 |
| 10/31/1974 | PF* | NMIMT11 | $1,500.00 | $0 | $0 | 08/31/1971 | 10/31/1974 |
| 10/31/1975 | PF* | NMIMT12 | $1,200.00 | $0 | $0 | 09/30/1970 | 10/31/1975 |
| | | | Loan Amt $19,039.00 | Principal $21,534.00 | Interest $33,664.00 | | Total $55,198.00 |

Complaint for Injunctive and Declaratory Relief from Garnishment

EXHIBIT 1

Loan Status: DU,  Loan Status Description:  DEFAULTED, UNRESOLVED
Loan Status: DS,  Loan Status Description:  DEFAULTED, THEN DISABLED
Loan Status: PF,  Loan Status Description:  PAID IN FULL
Loan Status: DW, Loan Status Description:  DEFAULTED, WRITE-OFF
*DW - Write-Offs are included in the Total Balances in the plaintiff's NSLDS text file
*PF -  Paid-in-Full are not included in the Total Balances

138.   The total balance, $55,198.00 is the amount that TOP has listed as the debt for plaintiff, as of February 3, 2022.  This total balance includes the false records for the principal amounts, $5,261.00, and interest amounts $7,012.00, for 3 Globe College loans that were written off.  The $1,000.00 Globe loan was used on the December 4, 2018 debt statement.  This $1,000 loan was presented to the plaintiff for collections by FHC on October 1, 2108, as a one cent loan.  This loan was submitted to TOP for collections by DRG , FHC, and Nelnet.  The principal amount on the $1,000 loan listed here is $1,052.00.  The principal amount on the debt statement is listed as one cent ($0.01) with an interest charge of $464.85.  This loan was written off on April 2, 1993.  DRG, Nelnet and FHC are using false records.  The Defendants are committing fraud and deceit by using a loan that was written-off to garnish the plaintiff's SSA Retirement Benefits.

| STATUS Effective Date | Status | Education Institution | Loan Amount | Outstanding Principal | Outstanding Interest | Loan Date | Disbursement Date |
|---|---|---|---|---|---|---|---|
| 4/02/1993 | DW | Globe8 | $2,500.00 | $2,631.00 | $2,907.00 | 12/16/1982 | 01/25/1983 |
| 4/02/1993* | DW* | Globe9 | $1,000.00 | $1,052.00 | $1,617.00 | 05/11/1982 | 06/22/1982 |
| 12/2/1999 | DW | Globe10 | $1,500.00 | $1,578.00 | $2,488.00 | 04/05/1982 | 04/27/1982 |
| Totals | | | $5,000.00 | $5,261.00 | $7,012.00 | | |

139.   Pursuant to 34 CFR § 674.47 (h)(2)&(3) (Costs chargeable to the Fund).  "*Write-offs of accounts.*  An institution that writes off an account under this paragraph may no longer include the amount of the account as an asset of the Fund.  When the institution writes off an account, the borrower is relieved of all repayment obligations."  The plaintiff's written-off loans and TPD

discharged loans have been submitted to TOP for collection. The defendants want the plaintiff to lie and say that she owes this debt by turning in a new TPD application and starting the discharge process all over again, to the detriment of the plaintiff.

140. This is the official description of the beginning of the discharge process. Pursuant to 34 CFR § 682.402 (c)(2)(ii) *Discharge application process for a borrower who is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 682.200(b). If the borrower notifies the Secretary ('the Department's DRG') of the borrower's intent to apply for a total and permanent disability discharge, the Secretary - (A) Provides the borrower with information needed for the borrower to apply for a total and permanent disability discharge; (B) Identifies all title IV loans owed by the borrower and notifies the lenders of the borrower's intent to apply for a total and permanent disability discharge; (C) Directs the lenders ('Nelnet and DRG') to suspend efforts to collect from the borrower for a period not to exceed 120 days; and (D) Informs the borrower ('Lola P. Thompson') that the suspension of collection activity described in paragraph (c)(2)(ii)(C) of this section will end after 120 days and collection will resume on the loans if the borrower ('Lola P. Thompson') does not submit a total and permanent disability discharge application to the Secretary within that time.*

141. Pursuant to 34 CFR § 682.402 (c)(2)(iii) If the borrower ('Lola P. Thompson') fails to submit an application for a total and permanent disability discharge to the Secretary ('the Department's DRG') within 120 days, collection resumes on the borrower's (Lola P. Thompson's) title IV loans, and the lender ('Nelnet and DRG') is deemed to have exercised forbearance of principal and interest from the date it suspended collection activity. The lender ('Nelnet and DRG') may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period, except that if the lender is a guaranty agency it may not capitalize accrued interest.

142. The Defendants used the statutes above against the plaintiff after they started this fraudulent, unlawful December 3, 2018 reinstatement. They paused her garnishment for 120 days,

EXHIBIT 1

while they waited for her to lie on her own self and say that she owed this illegal debt, by turning in

a false TPD application. They stopped collections after the July 3, 2019 payment and resumed

collections on December 3, 2019 because the plaintiff refused to submit a false TPD application.

They were trying to force the plaintiff to participate in this robbery of herself and fraud against the

Secretary of Education and the Secretary of the Treasury.

143. The Defendants are "recycling" the plaintiff's loans and collecting on them over and

over again. The Defendants got paid in full for the plaintiff's loan on January 20, 2012 when the

Secretary discharged her loans due to TPD on Account No. 1002320370. The Defendants got paid

in full again when the Secretary discharged her same identical loans due to TPD on May 9, 2013, on

Account No. E856039679 which was fraudulently created by Nelnet and the $36,765.82 total

balance was paid off in full on July 8, 2015. The documentation is online on www.nelnet.com. (see

Exhibit 57).

144. Now in 2018, the Defendants are trying to get paid in full again. More interest has

accrued at a "9%" rate and fees have been added, almost twenty thousand more dollars, to bring the

new total to $55, 198.00, This plaintiff is not about to lie on herself and create a debt that she does

not owe, by filling out a new TPD discharge application. She refuses to defraud herself and by

doing so defraud the U.S. Department of Education and help the Defendants submit false claims to

the Treasury program, TOP.

145. Should the plaintiff apply for a new TPD discharge and get approved, the Secretary

would pay Nelnet for the same discharged loans a third time pursuant to 20 U.S. Code § 1087 -

Repayment by Secretary of loans of bankrupt, deceased, or disabled borrowers; treatment of

borrowers attending schools that fail to provide a refund, attending closed schools, or falsely

certified as eligible to borrow - (a) **Repayment in full for death and disability.** (1) IN GENERAL- IF

a student borrower who has received a loan described in subparagraph (A) or (B) of section

1078(a)(1) of this title dies or becomes permanently and totally disabled (as determined in

48

accordance with regulations of the Secretary), or if a student borrower who has received such a loan is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, has lasted for a continuous period of not less than 60 months, or can be expected to last for a continuous period of not less than 60 months then "the Secretary shall discharge the borrower's liability on the loan by repaying the amount owed on the loan." The Secretary may develop such safeguards as the Secretary determines necessary to prevent fraud and abuse in the discharge of liability under this subsection.

146. The Secretary should develop safeguards to stop the contractors and members of his own Education Department from committing fraud in the borrower's name.

147. On June 27, 2019, the plaintiff was sent a new TPD discharge application by Nelnet (see Exhibit 8). FHC sent the plaintiff two TPD discharge applications on April 2, 2019 and December 17, 2020 (see Exhibit 9) and (Exhibit 9a). All three letters stated "Enclosed please find the Discharge Application: Total and Permanent Disability form you recently requested. You can return this form directly to the Department of Education via fax at 303-696-5250".

148. On July 19, 2019, DRG sent the plaintiff a letter insisting that she apply for total and permanent disability for a second time in order to stop this current garnishment. The Department's DRG letter states "On July 1, 2019, we were notified by the Nelnet Total and Permanent Disability Servicer that you requested a new discharge application. We have suspended collection for 120 days from that date. If we are not notified by the Nelnet Total and Permanent Disability Servicer that a completed application has been received by the end of the suspension period, we will resume collection of this debt." (see Exhibit 2).

149. The garnishment was resumed on December 3, 2019. The January 25, 2021 DRG letter to the plaintiff states "Because we were not notified by the Nelnet Total and Permanent Disability Servicer that a completed application was received, we resumed collection of this debt." (see Exhibit 3). DRG resumed collection of a debt that the plaintiff does not owe, because all of

49

her defaulted loans were discharged by the Secretary due to TPD on January 20, 2012.

150. Nelnet and FHC are currently earning profits in interest payments and collections fees from the plaintiff's offset payments from this garnishment in 2019 and 2020 (see page 20, line no. 4, item no. 53 above). All three of the Defendants sent the plaintiff a TPD discharge application. This means all the Defendants tried to get the plaintiff to return a completed TPD application to the Department which would help them continue recycling this fraudulent scheme to defraud the plaintiff and the U.S. Department of Education over and over again.

151. If the plaintiff is forced to submit a new TPD discharge application, the Department could deny the new application.   34 CFR § 682.402(c)(3)(v) If the Secretary determines that the physician's certification or SSA notice of award for SSDI or SSI benefits provided by the borrower does not support the conclusion that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 682.200(b), the Secretary notifies the. borrower and the lender that the application for a disability discharge has been denied."  The Defendants can now tell the plaintiff that she has to pay the entire balance on all her defaulted loans, a debt the plaintiff does not owe. It does not matter to the Defendants that the plaintiff's loans were discharged by the Secretary due to TPD on January 20, 2012 and no federal regulations were broken by the plaintiff.

152. Or, if the Department approves the discharge application then the plaintiff would have to be monitored again for three (3) years on top of the 10 years that she has already been monitored since her TPD discharge in 2012, until the present 2022. As stated very crudely in one of the letters to DRG and FHC "Eny, Meny, Minny, Mo, Catch a Black Female by the toe, and never, ever, let her go". The plaintiff would also have to comply with 34 CFR § 682.200(b)  "Definitions. (b) The following definitions also apply to this part:  Totally and permanently disabled. The condition of an individual who - (1) Is unable to engage in any substantial gainful activity. (A level of work performed for pay or profit that involves doing significant physical or mental activities, or a combination of both.) by reason of any medically determinable physical or mental impairment that -

50

(i) Can be expected to result in death;  (ii) Has lasted for a continuous period of not less than 60 months; or (iii) Can be expected to last for a continuous period of not less than 60 months."

153.  The plaintiff's original sixty (60) months of continuous disability would be extended to fifteen years total.  Should the plaintiff ask her doctor to fill out a new disability application and get it signed on January 9, 2022, the plaintiff's new 60 months of continuous disability would start on January 9, 2022 and end on  January 9, 2027, five years total.  The difference from January 20, 2012, the original discharge date to January 9, 2027, the new end-date is fifteen years, which is triple the original sixty months of time the plaintiff would have to be totally and permanently disabled.

154.  Eve did not get a second bite of the apple, why should the Department and Nelnet get a second and third bite of the plaintiff and extend the length of the disability for the plaintiff from a continuous period of not less than 60 months to triple that number, 180 months which is a continuous period of fifteen years.   No second bite of the apple for the plaintiff.  The plaintiff is not as mentally disabled as she was in 2012, which is the reason she is able to defend herself by filing this complaint.  However, the plaintiff is still mentally and physically disabled.  This current mental disability is total depression in the plaintiff because of having to fight against three giants to maintain her freedom, finances and dignity.

155.  According to page 2 on all five of the plaintiff's signed Promissory notes from NMSLGC: "Disability or Death - If I become totally and permanently disabled or if I die my obligation to pay any amount owed under this loan will be canceled." (see Exhibit 52).  The Secretary's discharge of the plaintiff's loans due to TPD  and the statement on her Promissory notes canceling her loans should prevent the Defendants from attacking the plaintiff, but nothing will stop them.  The high 9% interest rate on her Promissory Notes for 40 year old loans is driving these greedy, avaricious, inhumane, hard-hearted Defendants.

156.  If this court does not intervene, the Department will continue to steal 15 percent of the

51

plaintiff's SSA benefit payment and apply it to interest and fees every month of every year until the day that the plaintiff dies. The plaintiff is 72 years old and living below the poverty guideline for two, so she cannot afford to hire a lawyer to help her obtain her civil rights and her human rights, so she is trying to do it herself. The plaintiff earned her Retirement Benefits over a lifetime of hard work and sacrifices. This is worse than indentured servitude because there is a time limit, a contract date or agreement date in indenture. This has become a forever loan, like slavery where there are no time limits or rights for the oppressed.

157. This garnishment will continue if a higher authority does not stop it. The Department, Nelnet and FHC figure if they put a few fraudulent dates in the body of a couple of letters and send them to the plaintiff that should be sufficient enough to garnish her SSA Retirement Benefits. No federal regulations required. This court is the only way the plaintiff can challenge and stop the defendants' actions. 28 U.S.C. § 2201 "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." And 28 U.S.C. § 2202 (Further Relief) "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

**(II)  SECOND CAUSE OF ACTION:   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(1)  THE YEAR WAS 2006**

158.  The plaintiff became homeless and remained chronically homeless until January 1, 2011, when she moved into her current apartment.  The plaintiff was homeless for five years.

**(2)  THE YEAR WAS 2010**

158.  In 2010 what happened to the plaintiff only happens in science fiction books.  The plaintiff became two separate human beings.  One Lola was poor, mentally and physically disabled.  She was chronically homeless and lived at New Image Homeless Shelter in Los Angeles, CA the entire year.  She received her first SSDI Benefit Payment on March 26, 2010.  Two (2) months later, she started having her SSDI benefits garnished by two agencies, the U.S. Department of Education and the Internal Revenue Service.  See Exhibit 36, a Treasury Offset Summary that shows two offset payments on September 22, 2010.  This Lola is the plaintiff.

159.  The second Lola was rich, working and earning $85,996.00 for the year.  Fraudulent rich Lola lived in a million dollar home in a secluded millionaire bedroom community on 25037 Oliver Way, Stevenson Ranch, CA.  (See Exhibit 34).   The address is listed on a 2011 Treasury Offset Summary for a fraudulent 2010 tax refund payment of $7,110.00 to the Department by the rich Lola.  The plaintiff did not earn $85,996 in 2010 as reported on that fraudulent 1040 transcript of a W-2 that someone illegally placed in the plaintiff's IRS file (see Exhibit 29).This fraud was a criminal action using the plaintiff's name and social security number (SSN).  The plaintiff has had this SSN for almost sixty years.

160.  On January 22, 2010, the plaintiff received a letter from the Social Security Administration titled "NOTICE OF DECISION - FULLY FAVORABLE: 1. The undersigned finds the claimant is disabled pursuant to Medical Vocational Rule 201.06 (20 CFR 404.1520(g)). 2. The

claimant has not engaged in substantial gainful activity since April 1, 2009, the amended alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq.). The claimant has the following severe impairment(s): knee injury and mental depression (20 CFR Part 404.1520(c))" (see Exhibit 39, page 6).

144. On March 26, 2010 the plaintiff received her first SSDI Benefit Payment after living on General Relief for four years and two months, a California relief program for single adults. The county program awarded the plaintiff $221.00 a month along with an EBT card for food stamps.

145. Two months later, on May 26, 2010, the plaintiff benefits were garnished by the Department of Education and the IRS. The plaintiff was double-teamed, a basketball term meaning two players competing against one player. It is very difficult, almost impossible to beat a double-team. The plaintiff is using this term to describe having her benefits garnished by both the IRS for $154.95 and the Department for $128.05 (see Exhibit 36). The plaintiff had a benefit payment of $750.00 per month after the two offset payments. Homeless Lola would have to remain homeless for the rest of the year and voiceless for the next five months. The plaintiff was so traumatized by the garnishment that she lost her ability to speak. The plaintiff could not afford to buy food and pay rent in Los Angeles, California on $750.00.

**(3) THE YEAR WAS 2011**

146. In January 2011, the plaintiff was almost denied residency into her current apartment because there was a levy on her credit report in December 2010 when she applied for an apartment. The plaintiff had to beg and plead with the landlord in order to get an apartment in their building, even though she had a Section 8 Voucher. The levy was because Fraudulent Lola owed taxes for 2002, 2003 and 2006 according to the information on the fraudulent 1040 transcript.

147. On August 19, 2011 a refund was issued from the fraudulent 1040 transcript's W-2 withholding of $9,306 and applied as a tax refund to the Department for $7,110.97. The plaintiff

notified FSA and the Department that this money should be removed from her offset payments because this is not real money, it was created by fraud. The plaintiff did not work in 2010, so she could not file a tax return or receive a tax refund. The plaintiff proved this with the Identity Theft Affidavit she sent to the Department and to the IRS on June 13, 2019 (see Exhibit 37).

148. FSA has refused to admit that a $7,000.00 tax refund offset payment credited to the plaintiff's account is a fraudulent payment, and will not remove it from her records. On January 25, 2021, their response to my request to remove the payment from my loan account in their final letter to the plaintiff states "You state that the Department has credited an offset payment to your account in error. Your federal or state tax refund or other payment was offset in the amount of $7,110.97 and credited to your account on August 19, 2011. The Department only reports borrowers to the U.S. Department of the Treasury's Bureau of the Fiscal Service, Debt Management Services, as individuals who are not regularly paying on a debt held by the Department. The Department does not perform the offsets and is not provided with information about the source of any funds that may be offset. Any questions about the source of these funds should be directed to Treasury at 1-800-304-3107." (see Exhibit 3)

149. Treasury Offset SSA benefit payment from the plaintiff on August 24, 2011 was $154.95 to the Dept of Education. The $7110.97 tax refund offset payment on August 19, 2011 was fraudulent/phony money. The plaintiff received both offset information letters (see Exhibit 34). The address on the tax refund offset was not the plaintiff's address. It was addressed to: Lola I. Thompson, 25037 Oliver Way, Stevenson Rnh, CA 91381-1680, but was sent in an envelope with both offset letters from the Treasury Department.

150. On August 19, 2011 the IRS applied a $7,110.97 refund to the Education Department based on the fraudulent/fake 1040 account transcript. The codes below are listed on the fraudulent/phony 1040 transcript for 2010.

| 806 | W-2 or 1099 withholding | 04-15-2011 | -$9,306.00 |

| | | | |
|---|---|---|---|
| 846 | Refund issued | 08-19-2011 | $7,110.97 |
| 898 | Refund applied to non-IRS debt: $7,110.97 | 08-29-2011 | $0.00 |

**(4) THE YEAR WAS 2012**

151.  On August 20, 2012, a CP2000 Report, (see Exhibit 28) was created by the IRS by using a fraudulent 1040 transcript for tax year 2010 that had an annual income of $85,996.00.  The report shows only $24,772.00 was taxable, which should have raised a red flag.  The IRS claimed that income from the plaintiff's Social Security Disability (SSDI) Benefits, $15,495.00 for the year, was "Unreported Income" on top of the $85,996.00.

152.  The combined total income for tax year 2010 is $101,491, not bad for a homeless woman.  However, the plaintiff's only income for 2010 was a SSDI Benefit of $12,396.00 plus $3,099 retroactive payment for 2009, totaling $15,495.00.

153.  The CP2000 Report added an Adjusted/Corrected SSDI Benefit Pay, $13,171.00 to the taxable income listed on the fraudulent 1040 transcript which was $24,772.00.  The two income amounts produced a new taxable income of $37,943.00.  This fraudulent information was used to create a tax deficiency of $2,365, now $4,283.76.  This information currently appears on the fraudulent 1040 transcript with a March 25, 2013 date. (see Exhibit 29)

(FRAUDULENT) ACCOUNT TRANSCRIPT

Form Number: 1040 Tax Period:   Dec. 31, 2010
Taxpayer Identification Number: XXX-XX-6646    LOL THOM
Account Balance Due:   $4,283.76
Accrued Penalty: 0.00 as of:   Sept. 28, 2020
Account Balance Plus Accruals (this is not a payoff amount):   $4,291.14
Adjusted Gross Income:     $85,996.00
Taxable Income:     $37,943.00

| | | | |
|---|---|---|---|
| 922 | Review of Unreported Income | 03-11-2013 | $0.00 |
| 290 | Additional tax assessed 20131005 | 03-25-2013 | $2,365.00 |
| 196 | Interest charged for late payment 20131005 | 03-25-2013 | $127.02 |
| 196 | Interest charged for late payment 20203405 | 09-07-2020 | $925.49 |
| 276 | Penalty for late payment of tax 20203405 | 09-07-2020 | $646.25 |

**(5) THE YEAR WAS 2013**

154. On July 22, 2013, the fraudulent 1040 transcripts reported an IRS Code 971 as "Tax period blocked from automated levy program".

| 971 | Tax period blocked from automated levy program | 07-22-2013 | $0.00 |

**(6) THE YEAR WAS 2015**

155. On July 8, 2015, Nelnet's fraudulent Account No. E856039679, for the plaintiff and all of her loans was paid off in full with $36,300.97. This account was discharged due to TPD on May 9, 2013, a completely different discharge date from the plaintiff's real date on her real account.

156. On September 22, 2015, Nelnet reinstated Account No. 256546 for the plaintiff, which is also her DOE Account No. 1002320370. Collection of the plaintiff's SSDI benefits on this fraudulent reinstatement date, September 22, 2015 was blocked by the new policy change on October 6, 2015, by the Treasury Department. This is why Nelnet and DRG failed to send collection notices for this phony reinstatement date.

157. In a memo from the US Treasury dated October 6th 2015, Phyllis Brown, Director – Collection Inventory Delivery and Selection of the US Treasury announced a recent policy shift to exclude SSA disability insurance payments from the Federal Payment Levy Program (FPLP) effective for payouts after October 3rd 2015. This means that the disability portion of SSA benefits (SSDI) will be removed from the FPLP 15% Levy.

**(7) THE YEAR WAS 2016**

158. On January 1, 2016, the Plaintiff aged out of the Social Security Disability Program (SSDI). Her SSA benefits automatically rolled over to SSA Retirement benefits, as per SSA policy.

**(8) THE YEAR WAS 2017**

159. On April 17, 2017, the fraudulent 1040 transcripts reported an IRS Code 971 as the "First Levy Issued on Module". The plaintiff believes that this is the trigger or catalyst for collections from the IRS and the Department in 2018. Logic tells us that the doer of this fraud is either an employee of the Department or the IRS.

971          First Levy Issued on Module                    04-17-2017    $0.00

**(9) THE YEAR WAS 2018**

160. On November 5, 2018, here comes the double-team again. The IRS sent its first Tax Collection notice on November 5, 2018, Form CP40: "We assigned your overdue tax account to a private collection agency". The IRS is trying to collect on the fraudulent income tax assessment for tax year 2010 referred to above in item number 174, a CP2000 Report. And the Department is trying to collect on an illegal and fraudulent reinstatement of my TPD discharge of my student loans.

161. On November 16, 2018, Pioneer Credit sent the plaintiff a Delinquent Tax Notification stating "The Internal Revenue Service (IRS) assigned your past due tax obligation with Pioneer Credit Recovery, Inc., a private collection agency. Amount Due: $3,969.79, Kind of Tax: 1040, Tax Year: 201012, Tax Assessed: $2,365.00, Penalty: $646.25, Interest: $738.54, Fees: $220.00". (see Exhibit 35).

162. On October 1, 2018, the Department sent the plaintiff its first loan collection notice, "Account Number 1002320370, Balance : $51,029.93". This was followed by collection notices from its collection agent, FHC, with letters dated 10/01/18, 11/6/18, and 11/14/18 - "This is an attempt to collect a debt, Lola Thompson, Acct# 1002320370, Principal Balance $16,273.51, No SSN, No Authentication No".

163. This is what I mean by double-teamed, the IRS and the Department sending collection notices at or around the same time. The plaintiff responded to both agencies and their collection agents, Pioneer Credit and FHC, with one 25-page letter and an Identity Theft Affidavit.

164. The first double-team took the maximum allowable payments from $1,033 which was $283 and left the plaintiff with exactly $750 a month to live on. This time their combined total of 15% each would be $364.80 from the plaintiff's SSA benefit check of $1,216 leaving the plaintiff with $840.00 to live on. Right now depression has taken control of the plaintiff's mind, because this means the end of her ability to make her car lease payments and other bills. The plaintiff lost her voice and could not speak because of the last double team. The plaintiff was suffering from Post-Traumatic Stress Disorder (PTSD). This time around the plaintiff found her voice and it is filled with both anger and depression.

**(10) THE YEAR WAS 2019**

165. On May 3, 2019 garnishment of the plaintiff's SSA benefits by the defendants began and continued until the CARES Act suspended it temporarily. Seven offset payments were taken totaling $1,248.60. F.H. Cann & Associates, Inc. should have returned my education account to the Department, but instead they helped DRG and Nelnet initiate a garnishment.

166. On June 25, 2019, Pioneer Credit sent the plaintiff a letter dismissing her tax delinquent case. "As you were previously notified, Pioneer Credit Recovery, Inc., (PCR) a private collection agency, is a contractor for the Internal Revenue Service (IRS) assigned to collect your past due tax obligation. This letter is to inform you that your account has been returned to the Internal Revenue Service effective 06/24/2019. If you require assistance with your account, please visit www.irs.gov" (see Exhibit 41). Pioneer Credit returned the case to the IRS and refused to initiate a garnishment against the plaintiff on behalf of the IRS. Pioneer Credit acknowledged the fact that the plaintiff's documentation shows the CP2000 Report for tax year 2010 was based on

Complaint for Injunctive and Declaratory Relief from Garnishment
EXHIBIT 1

fraudulent information.  FHC should have returned those false, phony, fraudulent loans to the

Department's DRG and Nelnet instead of initiating collection proceedings.

### (III)    PRAYER FOR COMPENSATORY DAMAGES FOR FINANCIAL AND EMOTIONAL DISTRESS

167.  Refund of offset payments collected so far, $1,248.60 minus COVID-19 refund of

$180 equals  $1,068.60 plus 9 percent interest.

168.  Attorney fees pursuant to Code of Civ. Proc. § 1021 Except as attorney's fees are

specifically provided for by statute, the measure and mode of compensation of attorneys and

counselors at law is left to the agreement, express or implied, of the parties;  but parties to actions or

proceedings are entitled to their costs, as hereinafter provided..

169.  Financial cost of preparing and mailing documents from 2019 to 2021, $500.00.

170.  Cost of high interest on payday loans when the plaintiff's SSA benefits were being

garnished and she needed help to pay her car lease, rent, utility bills, and buy food.  The plaintiff

had to obtain high interest, 20 percent, payday loans every month, borrow $250 and pay back $300

every 30 days.  You get caught up in what is called catch 22.  When you pay the loan off you have

to borrow the loan again in order to pay your bills.   That adds up to $600 interest in one year.  The

only way the plaintiff was able to get out of this web was with cash from the Corona Virus Relief

bill payment.

171.  Cost of high interest on credit cards the plaintiff's used when her SSA benefits were

being garnished and she needed help to pay her car lease, rent, utility bills, and buy food.

172.  The levy placed on the plaintiff in 2017 created a negative mark on her credit report

and caused her three-year lease payments in 2018 to increase by $100.00 over her previous 3-year

lease in 2015, in which all 36 payments were made on time.  The plaintiff realizes the levy is an IRS

problem, but the fraud may have been caused by the Department.  The car lease payments for a

Chevy Cruz went from $273 per month to $373 per month. This was an increase of $100 over 36 months which equals $3,600 plus interest.

173. The plaintiff's eighteen (18) offset payments in 2010 and 2011 totaling $2,809.55 were applied to interest on three (3) Globe U. FFEL loans totaling $5,000, that were written-off in 1993 and 1999. The plaintiff is owed a partial refund of those payments plus interest. Principal on seven NMIMT loans was $14,041, not $16,273 for nine loans. The plaintiff's estimate is that twenty percent of her payments were applied to interest charges on loans that were written-off which would at minimum be equal to $561.91 plus 9 percent interest.

174. The plaintiff cannot put a price on the mental anguish and financial stress she has suffered since the garnishment began. The plaintiff has experienced great pain and suffering caused by depression and anger, no amount of money could compensate her. The depression and anger has a lasting effect on the plaintiff's health. They are major contributors to high blood pressure which the plaintiff has. This has probably taken years off the plaintiff's life.

175. Plaintiff has had to relive the worst period in her life, homelessness, staying at New Image Shelter for the Homeless, https://www.newimageshelter.com. The shelter warehoused 400 men and 200 women. The plaintiff slept in a huge warehouse on army cots that had been urinated on the night before, night after night. The plaintiff lived in one-bedroom apartments with two sets of bunk beds in the bedroom and two sets of bunk beds in the living room with eight women in the apartment. The County of Los Angeles paid landlords for this inhumane treatment. In one apartment the plaintiff lived in, a Fire Marshall came in and removed the bunk beds from the living room, so the plaintiff had to find another shelter.

176. The plaintiff was assaulted two times at two different locations, both instances left the plaintiff with a black eye and could have resulted in blindness or death. During the first incident, a female resident threw a can of condensed soup at the plaintiff's head from across the room. Blood went everywhere, the plaintiff was taken to the emergency room at St. Francis Medical Center in

Lynwood, CA where she received stitches on her face. The plaintiff was left with a two-inch scar above her right eye that she covers with bangs. The assailant was never apprehended.

177. Add that scar to the two-inch scar below the plaintiff's bottom lip caused by a car accident many years ago, and you have the beginning of a Frankenstein face in the eyes of the plaintiff. The plaintiff became completely and totally fearful and depressed. Both attacks were committed by young women who had recently been released from jail. The plaintiff lived this life for five years, from the ages of 56 to 61 from 2006 to 2011. The plaintiff was diagnosed with post-traumatic stress disorder (PTSD) by a psychiatrist in 2009. The plaintiff has never been to jail or broken any laws other than a traffic law for speeding many years ago.

178. The plaintiff was very afraid of losing her car lease because she did not want to walk the streets of Los Angeles again and deal with the pain on the bottom of her feet from walking everywhere for five years.   Losing her car would be a tragedy. The plaintiff's feet were ruined when they were burned while she was wearing plastic flip-flops on 95 degree days and 125 degree pavement. People don't walk their dogs during this type of heat because the pavement burns their paws. Most times the plaintiff could not choose to stay home on hot days or cold days, because men and women had to leave the shelters by 7:00 AM everyday, rain or shine. At New Image Shelter people would get on the buses that came at 7:00 AM to take them 30 blocks away to downtown Skid Row to spend the day. The plaintiff opted out of busing and started walking in the opposite direction to anywhere other than downtown Los Angeles. The plaintiff now experiences tremendous pain when she walks too far. The plaintiff is guaranteed to lose her car when the CARES Act ends on September 30, 2021.

179. The plaintiff's foot size grew from size 8 to size 10 after walking almost everyday and being a bag lady for five years. The plaintiff has bad feet and bad knees. She had angioplasty surgery on her left knee to remove 90% stenosis and a stent was put in above her knee like the ones that are put in your heart. The pain from bone touching bone in the plaintiff's knees is sometimes

unbearable. The plaintiff does not want to relive any more pain, so she will stop here.

180. All of the defendants should have to pay for acting above the law, with no respect for federal laws and regulations or human dignity. There is no reason on God's green earth for the defendants to continue this garnishment. If the court does not enjoin the defendants, only the plaintiff's death will stop this fraud and thievery.


### (IV)   PRAYER FOR RELIEF

Plaintiff prays that the Court:

181. Enter a declaratory judgment under 28 U.S.C. §2201 that this is an unlawful and fraudulent garnishment of the plaintiff's SSA Benefits.

182. Issue an injunction under 28 U.S.C. §2201 enjoining the defendants and their officers and agents from garnishing the plaintiff's SSA Benefits now and in the future. Injunctive relief is necessary to stop this fraudulent garnishment.

183. Enter a declaratory judgment under 28 U.S.C. §2201 that 34 CFR § 682.402 (Death, disability)(c)(6) (i)(A-D) Conditions for reinstatement of a loan after a total and permanent disability discharge have been willfully ignored as applied to plaintiff because no reinstatement conditions were met and the reinstatement date was not within the 3-year time limit. This is a violation of federal law.

184. Enter a declaratory judgment under 28 U.S.C. §2201 that the regulation 34 CFR § 682.402(c)(3)(i)(A) "The borrower is considered totally and permanently disabled - As of the date the physician certified the borrower's application", that the only valid TPD discharge date for the plaintiff is January 20, 2012, the date that the plaintiff's physician certified her discharge application.

185. Enter a declaratory judgment under 28 U.S.C. §2201 This date has been willfully ignored by the defendants.

186. Enter a declaratory judgment under 28 U.S.C. §2201 that the defendants created three fraudulent, arbitrary, capricious TPD discharge dates that were not physician certified. They have used March 1, 2012, May 9, 2013, and November 29, 2012. There should be only one discharge date as of the date the physician certified the borrower's application".

187. Enter a declaratory judgment under 28 U.S.C. §2201 that the conditions below for reinstatement were not satisfied; 34 CFR § 682.402 (Death, disability)(c)(6) (i)(A-D) (Conditions for reinstatement of a loan after a total and permanent disability discharge). (i) The Secretary reinstates the borrower's obligation to repay a loan that was discharged in accordance with paragraph (c)(3)(iii) of this section if, within three years after the date the Secretary granted the discharge, the borrower - (A) Has annual earnings from employment that exceed 100 percent of the poverty guideline for a family of two, as published annually by the United States Department of Health and Human Services pursuant to 42 U.S.C. 9902(2); (B) Receives a new TEACH Grant or a new loan under the Perkins or Direct Loan programs; or (C) Fails to ensure that the full amount of any disbursement of a title IV loan received prior to the discharge date that is made is returned to the loan holder; or (D) Receives a notice from the SSA indicating that the borrower is no longer disabled.

188. The NSLDS and DRG reinstatement date, September 22, 2015 is not within three years of the discharge date, January 20, 2012. The plaintiff was and is still living below the poverty guideline for a family of two. The plaintiff did not receive any new loans after her discharge in 2012. The plaintiff's final loan disbursement was on October 02, 1986 as shown in the NSLDS. Receiving a SSA notice does not apply to the plaintiff.

189. Enter a declaratory judgment under 28 U.S.C. §2201 that the defendants created three fraudulent/false reinstatement dates for the plaintiff: January 1, 2015, September 22, 2015, and

64

December 3, 2018.  A borrower should have only one reinstatement date and the plaintiff should not have a reinstatement date at all.

190.  Enter a declaratory judgment under 28 U.S.C. §2201 that the defendants should correct her ED database file by removing the illegal status - DU Defaulted/Then Unresolved with status date September 22, 2015 and then displaying the true status of her seven NMIMT loans as DS - Defaulted/Then Disabled with the Status Date - January 20, 2012.

190.  Enter a declaratory judgment under 28 U.S.C. §2201 that the reason given by the defendants, Nelnet and FSA, for the plaintiff's education loans to be reinstated is fraudulent.  The DRG states in three different letters to the plaintiff "Nelnet did not receive required financial information during the 3-year post-discharge monitoring period".   The three letters are dated January 25, 2021  (see Exhibit 1), July 19, 2019  (see Exhibit 2) and March 29, 2019 (see Exhibit 3).

191.  FSA sent the plaintiff a copy of her completed Form OMB No. 1845-0065, TPD Discharge: Post-Discharge Monitoring Form as an attachment with their final letter to the plaintiff on January 25, 2021.  The plaintiff sent Nelnet this completed and signed form on August  9, 2013 (see Exhibit 18).  This means that the defendant, DRG had in their possession proof that the plaintiff responded to a request for financial information by Nelnet and DRG willfully ignored the proof.  This is an abuse of discretion and malicious fraud.

192.  Enter a declaratory judgment under 28 U.S.C. §2201 that the plaintiff followed the regulations required for a borrower and did not default on her education loans according to  34 CFR § 682.402(c)(7)(i-iii)  (7) Borrower's responsibilities after a total and permanent disability discharge.  "During the three-year period described in paragraph (c)(6)(i) of this section, the borrower must -"

193. (i) Promptly notify the Secretary of any changes in the borrower's address or phone number.  The plaintiff did not have a change of address.

194. (ii) Promptly notify the Secretary if the borrower's annual earnings from employment exceed the amount specified in paragraph (c)(6)(i)(A) of this section.  The plaintiff's income stayed

65

within the poverty guideline for a family of two, from 2012 through 2015.

195. (iii) Provide the Secretary, upon request, with documentation of the borrower's annual earnings from employment, on a form approved by the Secretary.

When requested in 2013, the plaintiff sent the defendant, Nelnet a completed Form OMB No. 1845-0065, TPD Discharge: Post-Discharge Monitoring Form on August 9, 2013, which stated she had zero income from employment.

196. Enter a declaratory judgment under 28 U.S.C. § 2201 that the plaintiff's did not have any income other than Social Security in 2010 therefore she could not have a tax refund of $7,110, so she could not use it as an offset payment to the Department of Education. The $7,110 tax refund payment was created by fraud and is not real money. Please instruct the department to remove that payment from the plaintiff's account because it creates inaccurate and misleading information for the plaintiff and creates a dark shadow on the plaintiff's ability to prove fraud.

197. Award all reasonable attorney's fees, costs, and expenses under 42 U.S.C. §1988, or any other applicable law; and,

198. Grant compensatory, punitive and any other relief the Court deems just and proper.

DATED: _____
        February 7, 2022

                                        Respectfully submitted,

                                        _____
                                        Lola P. Thompson
                                        In Pro Per

                                        LOLA P. THOMPSON
                                        lipthompson@yahoo.com

## (V)  EXHIBIT LIST

1. DRG Letter to the plaintiff dated March 29, 2019 for Account:  1002320370

2. DRG Letter to the plaintiff dated July 19, 2019 for Account:  1002320370

3. DRG Letter to the plaintiff dated January 25, 2021 for Accounts:  1002320370, 256546 and E85603967952

4. Lola Thompson Response Letter dated January 12, 2021 to:   FSA/DRG, FHC

5. Lola Thompson Response Letter dated December 9, 2020 to:   FSA/DRG, FHC

6. Copy of form SSA-1099 for 2012 that was sent to Nelnet by the plaintiff and the form has a Nelnet stamp on it stating "Received June 13, 2013"

7. Offset Payments on FSA website, payments from 05/03/2010 to 03/03/2020

8. Nelnet Letter to the plaintiff dated June 27, 2019 with a new TPD discharge application

10. FH Cann Letter to the plaintiff dated October 1, 2018 ,Lola Thompson, Acct No. 1002320370,  No SSN, Total Balance - $51,029.93

10a. FH Cann Letter to the plaintiff dated 11/6/18, Lola Thompson, Acct No. 1002320370, No SSN, Total Balance - $49,996.76

10b. FH Cann Letter to the plaintiff  11/14/18, Lola Thompson, Acct No. 1002320370, November 14, 2018,  No SSN, Total Balance - $50,034.61, Fees - $7,603.65

9. FH Cann Letter to the plaintiff  with a new TPD discharge application dated April 4, 2019, Total Balance - $50,691.97,  Fees - $7,703.52

9a. FH Cann Letter to the plaintiff  with a new TPD discharge application dated December 17, 2020, $51,153.64,  Fees - $7,773.69

11. Account Control Technology (ACT) sent a letter to the plaintiff dated December 8, 2011 with a new TPD discharge application

12. The plaintiff, Lola Thompson, sent ACT a TPD application signed by Dr. Thomas Early on January 20, 2012

13. Nelnet sent a Discharge letter to the plaintiff dated May 29, 2013 with a discharge date of March 1, 2012 for Account No. 256546.

14. Nelnet's first request for employment income for 2012 to the plaintiff dated May 29, 2013 for Account No. 256546.

15. FSA Reinstatement Letter to the plaintiff with a reinstatement status effective date of January 3, 2015 and a discharge date November 29, 2012

16. Nelnet Discharge Letter to the plaintiff dated June 11, 2013 with a discharge date of May 9, 2013 for Account No. E856039679

17. Nelnet paid off in full Account No. E856039679 on July 8, 2015  with $36,300.00

18. Nelnet's second request for employment Income for 2012 to the plaintiff dated July 10, 2013 for Account No. 256546.

19. The plaintiff sent a completed Form OMB No. 1845-0065, TPD Discharge: Post-Discharge Monitoring Form on August 9, 2013

20. Social Security Form SSA-1099 marked as received by Nelnet on June 13, 2013

21. IRS Form SSA-1099 Benefits Statements for: 2012, 2013, 2014, and 2015

21a.  Social Security Form SSA-1099 Benefits Statements for: 2012 through 2015

22. The department sent a Default Letter to the plaintiff dated September 23, 2015 Debt amount $29,648.18

23. The department sent a Default Letter to the plaintiff dated September 23, 2015 Debt amount $6,965.67

24. FSA Transfer of Education Loan Servicer "So Your Loan Was Transferred, What's Next?" Online Information

25. The department sent a Transfer of Loan Servicer to Nelnet Letter to the plaintiff

68

dated November 7, 2012

26. Credit Report for Plaintiff from TransUnion: 9 Education Loans for Lola P. Thompson Transferred/Closed on November 6, 2012

27. Nelnet Welcome Letter to the plaintiff dated November 29, 2012 for Account No. 256546

28. IRS False Erroneous CP2000 Report dated August 20, 2012, a Tax Return Review by Mail for Tax Return Form 1040 for tax year 2010.  5 Pages

29. IRS False Fraudulent Account Transcript Form 1040 tax year 2010 illegally placed in the plaintiff's IRS file - Name: THOM - xxx-xx-6646   2 Pages

30. Nelnet sent a Refund Check to the plaintiff dated June 12, 2013 for $464.85

31. Lola Thompson second letter to IRS September 25, 2020, 9 pages

32. Enterprise_Recovery_Systems collection notice on May 24, 2012, five months after TPD discharge on January 20, 2012.  same principal, interest, same loans for Lola P. Thompson,  Principal Balance $15,808.66

33. Loan Summary for the plaintiff from Kenneth Aerts, the Director of Financial Aids at NMIMT, 12 Loans  - Principal balance is $14,041.  3 pages

34. US Treasury OFFSET  Summary of  a fraudulent IRS Tax Refund Payment on Aug 19, 2011 for $7,110.97,  Lola I. Thompson,  25037 Oliver Way, Stevenson Ranch, CA and the real offset payment of $154.95 for the plaintiff on Aug 24, 2011.

35. Pioneer Credit sent a Delinquent Tax Notification  for year 2010 to the plaintiff dated November 16, 2018, Lola I. Thompson, xxx-xx-6646, Authentication No. 2430622325

36. US Treasury OFFSET- Double Team OFFSETS on 9/28/2011 by Educ - $128.05 and IRS - $154.95

37. Lola Thompson Response Letter dated June 13, 2019 to:  the Department, DRG,

69

1     FHCann, Pioneer Credit, and the IRS

2   38. MyStudentData Download of 12 loans from the NSLDS for the plaintiff.

3   39. SSA Decision and Jurisdiction on January 22, 2010

4

5   40. FSA Account Dashboard  for the plaintiff- 12 Loans Total balance 55,198,

6     Education Servicer is Debt Management and Collections System (DMCS)

7   41. Pioneer Credit returned the plaintiff's tax file to the IRS on June 25, 2019.

8     They found no reason for garnishment because the CP2000 Report was based

9     fraudulent information.

10   42. Social Security Administration Lifetime Earnings Record for Lola P. Thompson

11   50. December 3, 2018  Debt Statement

12

13   51. Promissory Notes - 5 notes

14   52. Indemnification Agreements - 2

15   53. IRS Form SSA-1099 Benefits Statements for: 2019

16   54. Chart with History of Education Loan Interest Rates

17   55. TOP sent the plaintiff a notice  on March 1, 2019, announcing it would garnish the plaintiff's

18     SSA benefits after 5/2/2019

19   56. DRG Payment History Letter 12/23/2020 - First Offset Payment - Amount $177.15 Applied to

20     Interest $164.03  Applied to Fees $13.12

21   57. Nelnet was paid off in full $36,000 on July 8, 2015.

22

23

24

25

26

27

28

Complaint for Injunctive and Declaratory Relief from Garnishment
EXHIBIT 1